THOMAS E. JUDKINS AND THELMA JUDKINS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 69243. Filed February 25, 1959.

*Morris Fedder, Esq.,* for the petitioners.
*Joseph N. Ingolia, Esq.,* for the respondent.

OPINION.

DRENNEN, *Judge:* Respondent determined a deficiency in petitioners' income taxes for the calendar year 1955 in the amount of $4,177.35. The sole issue for decision is whether a lump-sum distribution of $18,949.75 received by Thomas E. Judkins, petitioner, in August of 1955 from the qualified retirement plan of the Waterman Steamship Corporation, his former employer, should be taxed as a long-term capital gain or as ordinary income.

This case was submitted on a stipulation of facts with a number of documents attached thereto as exhibits. The facts are found as stipulated and the stipulation, together with the exhibits, is incorporated herein by this reference.

Petitioners, Thomas E. Judkins and Thelma Judkins, are husband and wife residing in Baltimore, Maryland. They filed a joint income tax return for the calendar year 1955 with the district director of internal revenue at Baltimore, Maryland. Thelma Judkins is a party to this proceeding only because she and petitioner filed a joint return for the calendar year 1955.

Prior to June 1, 1955, petitioner was employed by Waterman Steamship Corporation, hereinafter referred to as Waterman, which is an Alabama corporation with its principal place of business in the city of Mobile, Alabama. On January 1, 1945, Waterman established a noncontributory retirement plan for its employees, and the employees of certain participating subsidiary companies. Petitioner, as an employee of Waterman, was a participant thereunder.

The retirement plan was administered by an administrative committee and all contributions to the plan were made to a trust which qualified as a tax-exempt trust within the provisions of section 165(a) of the Internal Revenue Code of 1939 in December of 1945 and, when the plan was terminated in 1955, qualified under section 401(a) and was tax exempt under section 501(a) of the Internal Revenue Code of 1954.

Relevant provisions of the plan provided that the employer could modify, amend, or terminate the plan at any time but no such termination, modification, or amendment should permit the corpus or income of the fund to be used for purposes other than the exclusive benefit of the participants and their payees. It also provided that upon termination of employment a participating employee, with certain qualifications not important here, would be entitled to retirement benefits accrued to date in the form of an annuity commencing on his normal retirement date. No provision was made for a lump-sum distribution of accrued benefits to a participating employee upon termination of service. The plan provided as follows with respect to the rights of participants on termination of the plan:

18. If the Plan shall be terminated, the Trustee shall continue to administer or liquidate the Fund * * * in accordance with the directions of the Committee for the purposes set forth in the Plan, including the Trust Agreement. In such event the obligations to Participants may be satisfied in such manner as the Committee shall deem advisable and as may be in accordance with law, including without limitation of the foregoing the purchase of annuities for such Participants from insurance companies. For the purposes of this paragraph the obligations to all Participants shall be deemed to be fixed as of the date of such termination * * *

In January of 1955, McLean Securities Corporation, hereinafter referred to as McLean, purchased from Waterman all of the outstanding stock of the Pan-Atlantic Steamship Corporation, a subsidiary of Waterman.

On March 28, 1955, C. Lee Co., Incorporated, hereinafter referred to as Lee, an Alabama corporation and a wholly owned subsidiary of McLean Securities Corporation, offered to purchase for cash the common capital stock of Waterman provided at least 80 per cent of the stock could be obtained and with the condition that the board of directors of Waterman would resign simultaneously with payment for the stock.

On May 5, 1955, pursuant to the offer of March 28, 1955, Lee purchased 865,980 common capital shares of Waterman at $48 per share. The block of stock constituted over 99 per cent of Waterman's outstanding common stock. The total purchase price of some $41,567,040 was borrowed by Lee from McLean. Lee pledged the Waterman stock to McLean as collateral security for the loan and all cash dividends were irrevocably assigned to the First National Bank of New York pursuant to a bank loan agreement between McLean and First National Bank of New York.

On May 5, 1955, subsequent to the purchase of its stock by Lee, the board of directors of Waterman met. Through a series of resolutions all previous directors of Waterman resigned and directors nominated by Lee were elected to take their places. Malcolm P. McLean, president of Lee and McLean, was elected chairman of Waterman. One of the first acts performed by the new directors was to declare a dividend of $22.87 per share on all outstanding common capital stock of Waterman. The chairman then suggested that the retirement plan be terminated. A resolution to terminate the retirement plan was adopted which included the following provisions:

Whereas, it is the desire of the Board of Directors of Waterman Steamship Corporation to terminate the Retirement Plan as of May 5 1955 for Employees of Waterman Steamship Corporation and Participating Subsidiary Companies and to grant the employees of Waterman Steamship Corporation and of each of the Participating Subsidiaries, including Pan-Atlantic Steamship Corporation and Gulf Florida Terminal Company, all rights and benefits accrued in accordance with the terms of the Plan as of the date of termination of said Plan and to distribute the liquidated assets in the Trust Fund to the participants in the Plan, as of date of termination of said Plan; and

Whereas, it is the desire of the Board of Directors of Waterman Steamship Corporation that termination of said Plan be conditioned on and subject to the full approval of the responsible officials of the Internal Revenue Service of the United States Treasury Department and that said Plan will not be terminated if such termination makes the Waterman Steamship Corporation or any of its Participating Subsidiary Companies or the Retirement Trust Fund whereby the Plan was financed liable for the payment of any taxes, for which any would not be liable if said Plan were not terminated, provided however, that should

the termination of said Plan be approved in full by said officials of the Internal Revenue Service of the United States Treasury Department, without consequent tax liability, and regardless of the date of such approval, the effective date of termination of said Plan will be May 5, 1955; and it is the intention of the Board of Directors to immediately submit to the proper officials of the Internal Revenue Service of the United States Treasury Department the necessary and required information and application for approval of the termination of said Plan;

Now THEREFORE BE IT RESOLVED, that as of May 5, 1955, the Retirement Plan for Employees of Waterman Steamship Corporation and Participating Subsidiary Companies, including Pan-Atlantic Steamship Corporation and Gulf Florida Terminal Company, is terminated, subject to the full approval of the Treasury Department without consequent tax liability, and the assets in the Trust Fund shall be liquidated and distributed among all participants in accordance with the obligation to each participant as required by law and in accordance with said Plan.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

RESOLVED, further, that the Administrative Committee, (as from time to time constituted), as provided in said Plan will continue to act as such until said Trust Fund is liquidated and all benefits thereunder determined, fixed and provision for payment of each made, and said Administrative Committee shall have full power and authority to decide and determine in the best interest of each Participant and in a non-discriminatory manner when and how the benefits payable under said Plan shall be made, including, but not limited to, lump sum cash payments of the actuarial value as of date of such payment of such benefit, purchase of and payment by annuity contracts, individual or group, periodic payments by the Trustee of such benefits from funds actuarialy [sic] determined and set aside with the Trustee for such purpose, or combinations of the above or others, and in making this determination the Administrative Committee may be guided by the wishes of each person entitled to benefits under the Plan as terminated, provided that such plan of payment will not violate the Plan, the law or the provisions of the approval of termination of said Plan by the Treasury Department.

RESOLVED, further that the application for, and the information necessary to support, termination of said Plan in accordance with this resolution be immediately forwarded to the officials of the Treasury Department, it being the intent, however, of the Board of Directors that said termination of said Plan will be null and void and without effect, unless such termination gets the full approval of the officials of the Treasury Department or if said termination of Plan will in any manner make the Waterman Steamship Corporation, any of its Participating Subsidiary Companies, or the Trust Fund liable for any taxes, for which any would not be liable if said Plan were not terminated, provided further, that such approval or such non-liability for taxes is a condition subsequent only and if such approval is obtained and such liability for taxes does not occur, then the effective date of termination of said Plan shall be May 5, 1955.

On May 17, 1955, Waterman requested a ruling regarding termination of the retirement plan. In a letter dated July 26, 1955, the Internal Revenue Service ruled that the proposed termination of the retirement plan would not affect the tax-exempt status formerly accorded it and also agreed with the assumption made by counsel for Waterman in his ruling request that a lump-sum distribution upon

termination of the plan would be taxable to the recipient as ordinary income in the year received.

Petitioner remained in the employ of Waterman in an executive capacity until June 1, 1955, at which time his employment was terminated for reasons not disclosed by the record. On August 1, 1955, he received a lump-sum distribution of $18,949.75 as a beneficiary of the plan.

On November 16, 1955, Lee and Waterman entered into a merger agreement whereby Lee merged into and with Waterman, with Waterman as the continuing corporation. As a result of the merger McLean, as former owner of all the stock of Lee, became the owner of all the issued common stock of Waterman. Since the date of the merger the continuing corporation has been operating as the Waterman Steamship Corporation and is so operating at the present time.

The issue for decision is whether the lump-sum distribution petitioner received in 1955 as a participant in the qualified retirement plan of Waterman Steamship Company, and subsidiaries, is taxable to him as ordinary income, as claimed by respondent, or as capital gain, as reported by petitioner.

The pertinent provisions of the Internal Revenue Code of 1954 are contained in section 402(a)(1) and (2).[1] The relevant part of paragraph (1) provides that the amount distributed to a distributee of a tax-exempt employees' trust shall be taxed to him in the year received as an annuity, but paragraph (2) provides an exception that "if the total distributions payable with respect to any employee are paid to

[1] SEC. 402. TAXABILITY OF BENEFICIARY OF EMPLOYEES' TRUST.

(a) TAXABILITY OF BENEFICIARY OF EXEMPT TRUST.—

(1) GENERAL RULE.—Except as provided in paragraph (2), the amount actually distributed or made available to any distributee by any employees' trust described in section 401(a) which is exempt from tax under section 501(a) shall be taxable to him, in the year in which so distributed or made available, under section 72 (relating to annuities) except that section 72(e)(3) shall not apply. The amount actually distributed or made available to any distributee shall not include net unrealized appreciation in securities of the employer corporation attributable to the amount contributed by the employee. Such net unrealized appreciation and the resulting adjustments to basis of such securities shall be determined in accordance with regulations prescribed by the Secretary or his delegate.

(2) CAPITAL GAINS TREATMENT FOR CERTAIN DISTRIBUTIONS.—In the case of an employees' trust described in section 401(a), which is exempt from tax under section 501(a), if the total distributions payable with respect to any employee are paid to the distributee within 1 taxable year of the distributee on account of the employee's death or other separation from the service, or on account of the death of the employee after his separation from the service, the amount of such distribution, to the extent exceeding the amounts contributed by the employee (determined by applying section 72(f)), which employee contributions shall be reduced by any amounts theretofore distributed to him which were not includible in gross income, shall be considered a gain from the sale or exchange of a capital asset held for more than 6 months. Where such total distributions include securities of the employer corporation, there shall be excluded from such excess the net unrealized appreciation attributable to that part of the total distributions which consists of the securities of the employer corporation so distributed. The amount of such net unrealized appreciation and the resulting adjustments to basis of the securities of the employer corporation so distributed shall be determined in accordance with regulations prescribed by the Secretary or his delegate.

the distributee within 1 taxable year of the distributee on account of the employee's * * * separation from the service * * * the amount of such distribution * * * shall be considered a gain from the sale or exchange of a capital asset held for more than 6 months."

The question is whether the amount received by petitioner was paid to him on account of his separation from service, all other requirements for capital gains treatment under paragraph (2) being present.

Respondent's position is that the lump-sum payment to petitioner was made because of termination of the plan by the employer and not because of petitioner's separation from the service of Waterman, and therefore the payment does not qualify for capital gains treatment. He relies on the fact the board of directors of Waterman adopted a resolution to terminate the plan, provided Treasury approval could be obtained, prior to the date petitioner actually left the employ of Waterman, and that the plan did not provide for a lump-sum distribution to an employee who separated from the service. We do not think these factors are controlling here.

On May 5, 1955, C. Lee Co., Incorporated, a corporation entirely independent of Waterman, acquired virtually all the stock and complete control of Waterman, petitioner's employer. According to plan the new stockholder immediately elected a new board of directors of Waterman of its own choosing. The new board immediately adopted a resolution to terminate the Waterman employees' retirement plan provided approval was first obtained from the Internal Revenue Service that termination of the plan would not have adverse tax consequences to the corporation or its subsidiaries. If approval was obtained the plan was to be terminated as of May 5, 1955. Approximately 3 weeks later, on June 1, petitioner's services with Waterman were terminated. On July 26 the Internal Revenue Service ruled that termination of the plan would have no adverse tax effects, and on August 1 petitioner received the lump-sum payment from the trust here involved, which was in discharge of all his benefits under the plan. On December 22, Lee merged itself into Waterman under a plan whereby Lee's parent corporation became the owner of all of Waterman's outstanding common stock.

Petitioner was actually separated from the service of his employer on June 1, 1955, at which time the pension plan had not definitely been terminated and before he had received any payment from the trust, and at a time when he could not have demanded any benefits except those payable because of his separation from the service. His rights under the plan became fixed on that date. No additional benefits would have accrued to him whether or not the plan was actually terminated. When 2 months later he received a lump-sum distribution of his benefits under the plan, in our opinion the payment was

made on account of his separation from the service of Waterman within the meaning of section 402(a)(2), I. R. C. 1954.

Both this Court and the Internal Revenue Service have recognized the plight of employee-participants in retirement plans that have been terminated due to a bona fide change in the ownership of the business and have found a "separation from the service" within the meaning of this Code provision even though the employees in fact continued in their same jobs with the new owners.

In *Mary Miller*, 22 T.C. 293, affd. 226 F. 2d 618, the May Company acquired all the assets of the Strouss-Hirshberg Company in exchange for May Company stock. Three days prior to this acquisition, the directors of the Strouss-Hirshberg Company adopted a resolution to terminate its qualified tax-exempt retirement plan under which petitioner was a participant. Later the petitioner received a lump-sum distribution upon termination of the plan. This Court held that the transfer of assets to the May Company constituted a separation from the service within the meaning of section 165(b) of the 1939 Code and that petitioner's rights under the plan became fixed on that date even though he continued in the employment of the May Company.

In *Lester B. Martin*, 26 T.C. 100, the Sperry Corporation purchased all the stock of the Dillinger Manufacturing Company and operated it as a subsidiary until April 1, 1949. On April 1, 1949, Dillinger was liquidated and all its assets were transferred to Sperry. Petitioner, an employee of Dillinger, became an employee of Sperry. Three days prior to the liquidation of Dillinger the pension board of Dillinger decided to either terminate its pension plan or continue it without further contributions. On August 4, 1949, after a favorable ruling from the Internal Revenue Service had been obtained, the pension board resolved to terminate the plan. Petitioner received a lump-sum distribution under the plan. Again we held that petitioner was separated from the service of his employer, Dillinger, at the time Dillinger was liquidated and his rights under the plan became fixed on that date, and that the payment he received was a distribution on account of his separation from the service even though it was paid upon termination of the plan and even though he continued in his same job as an employee of the purchaser, Sperry Company.

The Commissioner of Internal Revenue acquiesced in both of the above decisions. After certain statements contained in the Committee reports on section 402 of the Internal Revenue Act of 1954 (see S. Rept. No. 1622, 83d Cong., 2d Sess., pp. 54, 289) inferentially cast some doubt on the applicability of the capital gains treatment to distributions made upon termination of pension plans incident to and as a result of corporate reorganizations wherein there was an actual change of ownership of the business, as existed in the *Miller* and *Martin* cases, the Internal Revenue Service issued Revenue Rulings 58–94 through

58–98, 1958–1 C. B. 194, 197, 200, 201, 202, and subsequently Revenue Ruling 58–383, 1958–2 C.B. 149, in which it took the position that if an employees' retirement plan was terminated incident to a corporate reorganization which amounted to an actual change in ownership of the business for cash, and the employees of the former owner received lump-sum distributions of all their benefits under the plan within 1 taxable year as a result of such termination of the plan, such distributions would be deemed to have been made on account of separation from the service of the employer for purposes of section 402(a)(2) of the 1954 Code.

Here, while we do not have the type of corporate reorganization involved in the *Miller* and *Martin* cases and in the various revenue rulings, we do have a bona fide transfer of ownership and control of the business for cash as a result of which there was a termination of this plan. In addition, we have an actual termination of petitioner's employment with his employer. Both of these incidents occurred before petitioner received any distributions from the plan.

Respondent places great reliance on the fact that under the provisions of the retirement plan petitioner could not have received a lump-sum distribution because of his separation from the service and, therefore, the distribution received could not have been on account of separation from the service. He also points out that in the *Miller* and *Martin* cases this Court emphasized that the lump-sum payments there involved could be paid either because of separation from the service or termination of the plan. While admittedly such argument bears some weight we do not think it is controlling in this particular situation.

The Waterman retirement plan did not expressly provide for payment of a lump-sum distribution either upon termination of the plan or upon separation from the service of Waterman. Rather, if the plan was terminated the administrative committee could purchase annuities for the employees or satisfy the obligations to the participants in some other manner they deemed advisable. Normally upon termination of employment prior to retirement date, the participant would be entitled to retirement benefits in the form of an annuity. Here, inasmuch as the plan was to be liquidated completely and all funds were to be distributed to the participants, the committee apparently felt that it was best to provide for lump-sum distributions. Petitioner's rights under the plan having become fixed during the course of but prior to actual distributions under the plan, he apparently was also given the right to receive a lump-sum distribution. As was the situation in both *Miller* and *Martin*, the petitioner received the lump-sum distribution on account of separation from the service although the method by which he was paid may have been a result of the fact that the plan itself was being terminated.

It should be noted that none of the above-mentioned rulings issued by the Internal Revenue Service require, or even mention, that the retirement plan have a provision for lump-sum distributions in case of separation from the service of the employer. The rulings relate to lump-sum distributions made because of termination of the plans under the circumstances stated therein. If the lump-sum distribution is paid within 1 year because a plan is terminated incident to a transfer of ownership of the business for cash the Internal Revenue Service has stated that, under the circumstances, the employee will be deemed to have "separated from the service" of an employer and the receipt of the lump-sum distribution may be considered a gain from the sale or exchange of a capital asset held for more than 6 months. The distributions considered are apparently paid because of termination of the plan and under the termination provisions thereof even though the employees are entitled to report them as capital gains by virtue of being deemed to have separated from the service of an employer.

We think our conclusion on the facts in this case is consistent with the *Miller* and *Martin* cases and the interpretation of the law as made by the Internal Revenue Service in the revenue rulings above mentioned. Other cases cited by respondent and decided by this Court are distinguishable on the facts. In *Edward Joseph Glimske, Jr.*, 17 T.C. 562, and in *Clarence F. Buckley*, 29 T.C. 455, the acquiring corporation assumed the employer's obligations under the plan and continued the plan for some time after acquisition of the assets, and the petitioner remained in the employment of the acquiring corporation, so the petitioner's rights did not become fixed because of the change in ownership of the assets. In *Estate of Frank B. Fry*, 19 T.C. 461, affd. 205 F. 2d 517, the petitioner continued in the employment of the same employer for 2 years after he became entitled to and received his lump-sum distribution. In *Harry K. Oliphint*, 24 T.C. 744, affirmed on another point 234 F. 2d 699, the pension plan did not qualify at the time it was terminated and hence section 165 (b) did not apply. Respondent has cited no case which would require a different conclusion here.

On the facts here involved it is our opinion that the distribution received by petitioner in the year 1955 was paid to him on account of his separation from the service of his employer within the meaning of section 402 (a) (2) of the Internal Revenue Code of 1954, and is taxable as a gain on the sale or exchange of a capital asset held for more than 6 months.

*Decision will be entered for the petitioners.*