**Ben MARTIN and Rachel T. Martin,
Plaintiffs,**

v.

**UNITED STATES of America,
Defendant.**

**No. 4–62–Civ. 137.**

United States District Court
D. Minnesota,
Fourth Division.

Aug. 27, 1963.

Melvin R. Harris, Minneapolis, Minn., for plaintiffs.

Louis F. Oberdorfer, Asst. Atty. Gen., Edward S. Smith, David A. Wilson, Jr., and Edward J. Snyder, Attorneys, Department of Justice, Washington, D. C., and Miles W. Lord, U. S. Atty. for Minnesota, for defendant.

LARSON, District Judge.

On all the files and proceedings herein, and after due consideration, the Court makes the following:

## FINDINGS OF FACT

### I.

Ben Martin and Rachel T. Martin, plaintiffs herein, are husband and wife and reside in this District. They filed a joint federal income tax return for the calendar year 1955.

### II.

Plaintiffs' income tax return for 1955, at Schedule E, reported the receipt of $14,721.56 as ordinary income. This amount was received by the plaintiff Ben Martin on August 1, 1955, from the Waterman Steamship Corporation as a beneficiary under that company's Retirement Plan.

### III.

On December 22, 1958, the plaintiffs filed a claim for refund in the amount of $2,525.51 with the District Director of Internal Revenue at St. Paul, Minnesota.

This claim was disallowed by certified mail on June 15, 1960.

### IV.

This Court has jurisdiction of this action in accordance with Section 1346 (a) (1), Title 28, United States Code.

### V.

On January 1, 1945, the Waterman Steamship Corporation established a Retirement Plan for Employees covering its own employees as well as employees of certain participating subsidiary companies.

### VI.

Under the terms of the retirement plan the Waterman Steamship Corporation bore fully the expense of the plan. The plan itself did not provide for any lump sum distribution to be made to any employee because of his or her separation from the service of the employer. Article 18 (RIGHTS OF PARTICIPANTS ON TERMINATION) states:

"Article 18. If the Plan shall be terminated, the Trustee shall continue to administer or liquidate the Fund (except such parts thereof as may be required to be repaid to the company and/or the Participating Subsidiary Companies pursuant to AMENDED Article 8 and Article 17 hereof or as the result of a surplus resultant of an actuarial error, and as stipulated in AMENDED Section 20 of the Trust Agreement) in accordance with the directions of the Committee for the purposes set forth in the Plan including the Trust Agreement; such directions of the Committee being restricted to a stipulation of administrative policy applicable to all participants. In such event the obligations to Participants may be satisfied in such manner as the Committee shall deem advisable and as may be in accordance with law, including without limitation of the foregoing the purchase of annuities for such Participants from insurance companies. For the purposes of this paragraph the obligations to all Participants shall be deemed to be fixed as of the date of such termination and if the Fund is insufficient to satisfy all such obligations such obligations shall abate pro rata."

### VII.

On or about January 21, 1955, McLean Securities Corporation purchased for cash from Waterman Steamship Corportion all of the outstanding stock of Pan-Atlantic Steamship Corporation, a subsidiary of Waterman.

### VIII.

On March 28, 1955, C. Lee Co., Incorporated, an Alabama corporation and a wholly owned subsidiary of McLean Securities Corporation, offered to purchase for cash the common capital stock of Waterman Steamship Corporation provided at least eighty per cent of the stock could be obtained and with the condition that the Board of Directors of Waterman Steamship Corporation would resign simultaneously with payment for the stock.

### IX.

On May 5, 1955, pursuant to the offer of March 28, 1955, C. Lee Co., Incorporated, purchased 865,980 of the outstanding common capital shares of Waterman Steamship Corporation at $48.00 per share. The stock purchased constituted over ninety-nine per cent of the outstanding common stock of Waterman Steamship Corporation. The total purchase price of $41,567,000.40 was borrowed by C. Lee Co., Incorporated, from McLean Securities Corporation. McLean Securities Corporation had previously made arrangements to borrow the purchase price of the Waterman stock from the First National City Bank of New York. C. Lee Co., Incorporated, pledged the Waterman Steamship Corporation stock to McLean Securities Corporation as collateral security for the loan from McLean. All cash dividends were irrevocably assigned by C. Lee Co., Incorporated, to the First National City Bank of New York.

### X.

On May 5, 1955, subsequent to the purchase by C. Lee Co., Incorporated, of the Waterman Steamship Corporation stock, the Board of Directors of Waterman Steamship Corporation met and, through a series of resolutions, all previous directors and officers of Waterman Steamship Corporation resigned, and directors nominated by C. Lee Co., Incorporated, were elected to take their places. Malcolm P. McLean, President of C. Lee Co., Incorporated, and McLean Securities Corporation, was elected Chairman of Waterman Steamship Corporation at the meeting. The new Board of Directors of Waterman then elected new officers of Waterman and declared a dividend of $22.87 per share on all outstanding common capital stock of Waterman. Also, at this meeting, the Chairman suggested that the Retirement Plan be terminated and a resolution terminating the Plan was adopted. Such termination was conditioned on full approval by the responsible officials of the Internal Revenue Service of the United States Treasury Department that termination of the Plan would not have adverse tax consequences to Waterman Steamship Corporation and its subsidiaries.

### XI.

On May 17, 1955, the Waterman Steamship Corporation requested that the District Director of Internal Revenue at Birmingham, Alabama, issue a ruling regarding the termination of the retirement plan. After the exchange of various correspondence between the company and representatives of the Internal Revenue Service, it was determined that the termination of the trust did not affect the tax-exempt status formerly accorded it. The Internal Revenue Service also ruled that a lump-sum cash distribution by the trust would be taxable to recipient as ordinary income in the year received.

### XII.

All participants in the Waterman Steamship Corporation Retirement Plan were notified by letter dated February 24, 1956, that a lump-sum cash distribution would be taxable as ordinary income in the year in which it was received.

### XIII.

All contributions to the Retirement Plan were made to a trust which qualified as a tax-exempt trust within the provisions of Section 165(a) of the Internal Revenue Code of 1939 in December of 1945 and, when the Plan terminated as of May 5, 1955, qualified under Section 401(a) and was tax-exempt under Section 501(a) of the Internal Revenue Code of 1954.

### XIV.

On November 16, 1955, C. Lee Co., Incorporated, and Waterman Steamship Corporation entered into a Joint Agreement of Merger whereby C. Lee Co., Incorporated, merged into and with Waterman Steamship Corporation. The agreement contemplated that Waterman Steamship Corporation would be the "continuing" corporation, that no new corporation would be formed by the agreement and that the existence of the Waterman Steamship Corporation would be perpetual. The Joint Agreement of Merger was effected after C. Lee Co., Incorporated, which was a wholly owned subsidiary of McLean Securities Corporation, had purchased over ninety-nine per cent of the outstanding stock of Waterman Steamship Corporation and after the directors and officers of McLean Securities Corporation had been elected as directors and officers of Waterman Steamship Corporation. As a result of the merger, McLean Securities Corporation, as the former owner of the stock of C. Lee Co., Incorporated, became the owner of all the issued stock of Waterman Steamship Corporation. Since the date of the merger, the continuing corporation has been the Waterman Steamship Corporation and is so operating at the present time.

### XV.

By resolutions adopted on December 22, 1955, both the C. Lee Co., Incorpo-

rated, and the Waterman Steamship Corporation approved and adopted the Joint Agreement of Merger.

## XVI.

Before and since the date of the merger set forth above, Waterman Steamship Corporation has been operating in its own names and is so operatińg at the present time.

## XVII.

At no time did the plaintiff Ben Martin own any stock or participate in the management of the Waterman Steamship Corporation, C. Lee Company, Inc., or McLean Securities Corporation. He had twenty-five years of service with the Waterman Steamship Corporation in 1955 when C. Lee Company, Inc., bought 99% of the outstanding stock of the Waterman Steamship Corporation.

## XVIII.

The plaintiff Ben Martin never received any correspondence referred to in Paragraph XII.

## XIX.

The plaintiff Ben Martin received no advance notice of the termination of the Retirement Plan or of the change of ownership of the Waterman Steamship Corporation prior to his receipt of the distribution under the Retirement Plan.

## XX.

He received no other distribution from the Retirement Plan other than the $14,721.56 received on August 1, 1955.

## XXI.

The employees of the Waterman Steamship Corporation were not given any choice upon receiving the payment under the Retirement Plan in one lump sum.

## XXII.

For about twenty-five years before, on, and since May 5, 1955, and during all of 1955 and continuing thereafter, the plaintiff Ben Martin was continually employed by the Waterman Steamship Corporation and is still so employed. During all of 1955 and continuing until the present, the plaintiff Ben Martin's position with the Waterman Steamship Corporation has been as a shipmaster.

## CONCLUSIONS OF LAW

### I.

This Court has jurisdiction.

### II.

The distribution to plaintiff employee taxpayer was an account of his separation from service within Section 402(a) (2) of the Internal Revenue Code.

### III.

The distribution to plaintiff employee taxpayer is taxable at capital gain rates and not at ordinary income rates.

### IV.

Plaintiff taxpayers are entitled to judgment.

## ORDER FOR JUDGMENT

Judgment will be entered for plaintiffs for the sum of Two Thousand Five Hundred Twenty-five and 51/100 ($2,525.51) Dollars, plus interest as provided by law.

## MEMORANDUM

Section 402(a) (2) of the Internal Revenue Code provides that lump-sum distributions from a "qualified" employees' trust, as defined in § 401(a), to an employee will be treated as a capital gain "if the total distributions payable with respect to any employee are paid to the distributee within 1 taxable year of the distributee on account of the employee's death or other separation from the service * * *." The question in this case is: Was the payment to taxpayer made on account of his separation from the service of his employer? If this test is not met, since the plan is a non-contributory one, the entire payment will be taxable in one year as ordinary income under § 72 of the Internal Revenue Code.

Capital gain treatment for lump sum distributions from a qualified employee trust came into the Code in 1942 as §

162(a) of the Revenue Act of 1942.[1] It was in the 1939 Code as § 165(b). The Report of the Senate Finance Committee is silent as to why capital gains treatment was afforded these distributions.[2] It has been suggested that the reason was relief from the impact of progressive rates upon ordinary income which is bunched in a particular year.[3] Tax relief, thus, seems the only plausible basis for the capital gains provision.[4]

Recently capital gains treatment for lump sum qualified plan distributions has been opposed by Treasury policy makers. The Assistant Secretary of the Treasury has referred to such treatment as "ill-considered and unwise."[5] The new retirement plan for self-employed individuals expressly proscribes capital gains treatment for lump sum distributions.[6]

Against this background the Government argues that the words of the statute do not cover taxpayer's situation, since he continued on in Waterman's employ after the payment was made to him. The payment was made because of termination of the plan rather than separation from the service of the employer. The taxpayer argues, in effect, that there is a separation from the service of a corporate employer when there is a complete change in the ownership of the stock in the corporation and the new owner terminates the pension plan.

The Government's position would be stronger if it could point to a consistent record of interpreting separation from service as meaning a termination of employment. It does not have such a record. It cannot avoid a series of Revenue Rulings finding a separation from service where there has been a substantial change in the ownership of the employer. In Rev.Rul. 58–383, 1958–2 Cum. Bull. 149, M corporation offered to exchange shares of its voting stock for shares of the outstanding common of O corporation, provided at least 80% of the O shares were offered. More than 80% of the O shares were offered, and the agreed exchange was affected. At this point M was in control under I.R.C. § 368(c). M then had O merged into itself. All employees of O continued as employees of M, but the O pension plan was terminated. It was held that lump sum distributions made to O employees pursuant to the pension plan termination were to be taxed at capital gains rates. The factual differences between the above situation and the instant case are that the merger in the former case was preceded by a § 368(a) (1) (B) reorganization and that in the instant case the controlling corporation merged into the controlled corporation.

Rev.Rul. 58–94, 1958–1 Cum.Bull. 194, involved a § 368(a) (1) (C) reorganization (exchange of stock for assets) where M company transferred its assets and liabilities to P corporation in exchange for P stock, followed by P's transferring the assets and liabilities to S corporation, a wholly owned subsidiary, in exchange for S stock. The M employees became employees of the S corporation and the M company pension plan was terminated. It was held that the M employees who received distributions under the terminated plan were entitled to capital gains treatment. The Ruling said:[7]

"It is * * * the position of the Internal Revenue Service that Congress did not intend in section 402

1. 56 Stat. 862 (1942).

2. S.Rep. No. 1631, 77th Cong. 2d Sess., 1942–2 Cum.Bull. 504, 607.

3. Lyon, Capital Gains Benefits Connected with Executive Retirement, 12 N.Y.U. Tax Inst. 365, 366 (1954).

4. Cf. 1 Casner, Estate Planning 344 (1959). "It might be prohibitively costly to have the employee's benefit paid in a lump sum if the distributee will be required to include all or most of the payment in his

gross income for the year in which distribution is made."

5. Hearings before the Senate Finance Committee on the nomination of Stanley S. Surrey to be Assistant Secretary of the Treasury, 13–15, 52 (1961).

6. Int.Rev.Code of 1954, § 402(a) (2), as amended by § 4(c) of the Self-Employed Individuals Tax Retirement Act of 1962, Pub.Law 87–792.

7. 1958–1 Cum.Bull. at 196.

to discriminate against the employees of a corporate employer by extending to them less favorable treatment than would be accorded under section 402(a) (2) in cases involving separation from the service of a noncorporate employer. The legislative history of section 402 discloses instead an attempt to deal, in the first instance favorably but in the ultimate outcome unfavorably, so far as concerns the perspective effect of the section, with a phase of the subject of separation from employment which is peculiar to the termination of plans of corporate employers by reason of corporate liquidations or reorganizations. This history makes it plain that a corporate liquidation or reorganization which brings about a change in employment relationship in no more than a formal or technical sense, and which does not involve a substantial change in the make-up of employees, is not enough to constitute a "separation from the service" under section 402(a) (2). Nothing in the language of section 402 or in its legislative history, however, suggests that a separation from the service of a corporate employer does not occur where a corporate liquidation or reorganization is not itself the cause of termination of the employer's plan but is merely incident to such a change in the ownership of the business as might occur in the case of a noncorporate employer. If, for example, the termination of a corporate employer's plan is incident to a sale of its stock to another corporation for cash, followed by the immediate merger of the employer corporation into the purchasing corporation, distributions to its employees under the plan may be on account of a

separation from service, just as in the case of an individual or partnership employer which has sold its assets for cash, even though substantially all employees of the former business are re-employed by the purchaser." [8]

In Rev.Rul. 58–95, 1958–1 Cum.Bull. 197, M corporation purchased all the stock of O corporation. O continued as a subsidiary of M for several months and then liquidated, terminating its employee pension plan. The Ruling (at p. 198) stated that the Martin case,[9] which held that liquidation of a subsidiary resulted in a "separation from the service" of the liquidated corporation, would not be followed. It then went on to point out:

"Nevertheless, it is considered that the [Martin result] might be reached on similar facts under section 402(a) (2) of the Code, provided the acquisition of stock of the liquidated corporation and the later liquidation may be regarded as an integrated transaction in substance involving the purchase of the assets of the former employer corporation. The rule is well established by court decisions that the acquisition of the assets of a corporation in a series of steps, involving an initial purchase of its stock and the later liquidation or merger of the acquired corporation into the acquiring corporation, may in substance constitute an acquisition of the assets for cash. * * * In such cases there is a real, as distinguished from a purely formal or technical, change in the ownership of the business, and the fact that the necessary series of steps includes a corporate liquidation or reorganization does not preclude the result that a 'separation from the service' of the for-

8. Mary Miller, 22 T.C. 293 (1954), aff'd 226 F.2d 618 (6th Cir. 1955), (A) 1958–1 Cum.Bull. 7, also involves a stock for assets reorganization where the acquired corporation terminates its pension plan

and dissolves. Capital gains treatment was allowed.

9. Lester B. Martin, 26 T.C. 100 (1956), (A) 1958–1 Cum.Bull. 7.

mer employer corporation has occurred." [10]

Rev.Rul. 58–96, 1958–1 Cum.Bull. 200, found a distribution on account of an employee's separation from service when all the assets of the employer corporation were sold incident to a plan of complete liquidation and the pension plan was terminated. This same result was reached by Rev.Rul. 58–97, 1958–1 Cum. Bull. 201, when a corporation, operating through two divisions, sold one as part of a plan of complete liquidation and terminated that division's pension plan by making payments to the employees. In Rev.Rul. 58–98, 1958–1 Cum. Bull. 202, a corporation with two stockholders dissolved and a successor partnership was formed to carry on the business. The pension plan of the corporation was carried on in the partnership, but the two partners were not eligible to participate, though they had been in the corporate situation. It was held that the lump sum distribution to them was on account of "separation from the service" of the corporation.

In Rev.Rul. 58–99, 1958–1 Cum.Bull. 202, P corporation controlled S corporation. S had a pension plan. Control of S was obtained by interests other than P, and at that time the plan was discontinued and the amounts standing to the credit of S employees distributed to them. The I.R.S. denied capital gains treatment to these employees, holding that the distributions were not made on account of "separation from the service" because the employees of S continued to work for S. Although the Government briefs do not discuss this ruling, it seems to support the Government position in the instant case. However, if Rulings 58–94 and –95 are read as stating the I.R.S. position to be that a real change in ownership resulting in a termination of a pension plan will constitute a "separation from the service" of the former "real owners" of the corporation, then Rev.Rul. 58–99 seems oddly out of line. Yet by so ruling, the Government foreshadowed its position in the instant case. This position seems to be that the formality of the lack of change in name or corporation merger procedure will control and that the Government will, in such a case, refuse to look through the form to the substance of the transaction. Such a position seems irreconcilable with Rulings 58–94 and –95. The Government's failure to cite 58–99 could have been a matter of strategy, for they would have had a hard time explaining –94 and –95 in relation to –99.

Section 402(e) is entitled "Certain plan terminations" and is of limited scope. Congress required that the distribution be made in 1954 and that the termination of the plan be incident to the complete liquidation of the corporation before August 16, 1954. The liquidation of the corporation need not have been incident to a reorganization as defined in § 368(a). If these conditions were satisfied, the distributions were deemed to be on account of separation from the service. By this provision Congress may have only intended to place corporations in complete liquidations on an equal footing with sole-proprietorships and partnerships and not to have excluded reorganizations of all kinds, including changes in ownership.

The Government, however, cannot disregard the development since 1954. If this development has been confused, the Government's own Rulings have contributed to the confusion. These Rulings have been discussed above. The Martin and Miller cases, where a separation from service has been found upon a termination of the pension plan and liquidation of the former employer corporation, have been cited. The Seventh Circuit has indicated that it understands that a bona fide transfer of ownership and control causing termination of a pension fund constitutes a separation from service.[11]

---

10. At p. 10.

11. McGowan v. U. S., 277 F.2d 613, 615 (7th Cir. 1960), affirming 175 F.Supp. 364 (E.D.Wisc.1959).

The Seventh Circuit position was expressed in the course of distinguishing the case of Thomas E. Judkins.[12] This case involved the identical pension plan under consideration in the instant case. Judkins actually terminated his employment with Waterman on June 1, 1955. The Waterman pension plan was terminated as of May 5, 1955, conditional on an Internal Revenue Service ruling on the tax effects to Waterman of the termination which was issued on July 26, 1955. The Court said:

"Here, while we do not have the type of corporate reorganization involved in the Miller and Martin cases and in the various revenue rulings, we do have a bona fide transfer of ownership and control of the business for cash as a result of which there was a termination of this plan. In addition, we have an actual termination of petitioner's employment with his employer. Both of these incidents occurred before petitioner received any distributions from the plan." [13]

and held that the payment was made on account of separation from service. The Waterman plan was involved in the case of Johnson v. U. S. [14] where the taxpayer continued in the Waterman Corporation employ until 1957. The Court found a separation from service, following Judkins. In Peebles v. U. S.,[15] the taxpayer was an employee of a Waterman subsidiary. This subsidiary was sold on June 14, 1955, to one Leatherbury. The Court held that the payment to Peebles out of the Waterman fund was made on account of separation from the service of Waterman.

■ The Government's major attack on Judkins is that there was no finding of an actual separation from service. The Government argues that the payment to taxpayer was the result of the termination of the plan and not on account of his separation from the service of Waterman. It repeats the argument rejected in Judkins that taxpayer could not have received a lump sum distribution because of his separation from service since the Plan did not make provision for such a payment. The Judkins court answered this contention by arguing that (pp. 1029–30) the lump sum payment was a reasonable way to terminate the plan, since the plan was to be completely liquidated. Such liquidation determined the method of payment, but the payment was received on account of separation from service of the employer. Moreover, the I.R.S. in its Rulings had never indicated that the plan must contain such a provision for a payment to be deemed to be made on account of separation from service. This brings payment to taxpayer within the words of the statute. "On account of" denotes a causal relationship [16]—the payment must have been made because of the separation from the service. Assuming that a change of corporate ownership is a separation from service, was not the requisite causal relationship present in this case? The change of ownership meant a termination of the plan. When such a termination is incident to a change of ownership of the business, the employee will be deemed to have separated from the service of the employer and the payments out of the plan will be viewed as made because of the separation.[17]

The assumption that a change of ownership of a corporation results in an employee's separating from the service of the original owner does not require a strained construction. If Waterman had merged into Lee and Lee had been the continuing corporation, there would have been a separation from the service of Waterman on the part of taxpayer. The

12. 31 T.C. 1022 (1959), (A-partial) 1959–2 Cum.Bull. 5, withdrawn 1963–21 Int. Rev.Bull. 7.

13. 31 T.C. at 1029.

14. 63–1 U.S.T.C. Par. 9404 (S.D.Ala.1963).

15. 208 F.Supp. 385 (S.D.Ala.1962), 62–1 U.S.T.C. Par. 9716.

16. Webster's New International Dictionary, p. 15 (1932) lists as a meaning for "on account of"—"because of."

17. See Judkins, 31 T.C. 1022, 1030 (1959).

Government apparently concedes as much.[18] Why should it make any difference here which way the McLean directors walked around the table? The form of corporate reorganization is determined by many different factors such as a desire to utilize one corporation's good will in a name, limitation of appraisal rights, or utilization of one corporation's net-operating loss carry-over. None of these may affect the financial reality of the transaction. If we are to follow the authority holding a transfer of ownership a separation from service, we should not be put off by the form of the transaction, but make our decision on the basis of genuine transfers of ownership. If we are to reject this authority, the rejection should be based on an interpretation of the statute rather than on a distinction based on a corporate formality.

The Government fails to meet this argument (see pages 4 and 5 of the Government's Reply Brief). It counters with three short declaratory sentences and a red herring. The reverse-merger situation is relevant because the case would come out differently according to the Government's own Revenue Rulings.

This decision favoring the taxpayer would seem to conform with the original congressional purpose for allowing capital gains treatment for lump sum distributions: relief from high progressive rates. Moreover, it would seem that the "bunching" argument is the soundest one for allowing capital gains treatment as a matter of tax policy.[19]

The taxpayer is entitled to capital gains treatment on the lump sum distribution.

18. Brief for the Defendant, p. 12. See Rev.Rul. 58–94, –95, –383.

19. See Blum, A Handy Summary of the Capital Gains Arguments, 35 Taxes 247, (1957):

"A capital gain realized in a particular year may represent appreciation that took place over a span of many years. To tax the whole gain as income in the year of realization would be manifestly unfair under a system of progressive rates, and perhaps even would be unfair under a proportionate tax the rates of

which fluctuated considerably from year to year. Progressive rates would subject the gain to a rate higher than appropriate for the true circumstances of the taxpayer. Fluctuation of rates would contribute a fortuitous element in taxing the gain, especially where the year of realization was beyond the control of the taxpayer. Together these considerations seems to present a strong case for not taxing realized capital gains in the same fashion as regularly recurring elements of income."