VICTOR S. GITTENS AND BERNICE GITTENS, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6783–65.   Filed January 25, 1968.

*Thomas P. Glassmoyer* and *Fred L. Rosenbloom*, for the petitioner.
*Edward L. Newberger*, for the respondent.

420

OPINION

Petitioner received within 1 taxable year the total distribution payable to him under an employees' trust which was exempt from tax under section 501(a). Consequently, we must decide whether the distribution was made "on account of the employee's * * * separation from the service," resulting in capital gains treatment under section 402(a)(2).[2]

Petitioner was a salaried employee of Philco-Penn from its inception and continued to be employed in the same capacity by Philco-Del until his retirement on June 30, 1965. He contends that when the corporate reorganization occurred the change in his employment from Philco-Penn to Philco-Del constituted a "separation from the service" of his employer, Philco-Penn, and claims that the lump-sum distribution he received from the trust was "on account of" that separation. Respondent joins issue on both points.

Passing for the moment the question whether the reorganization of Philco-Penn caused a "separation from the service," we think it is perfectly clear that the distribution received by petitioner was "on account of" the reorganization. The facts establish a causal relationship between the reorganization and the distribution. On December 8, 1961, incident to the "closing" process, the board of directors of Philco-Penn amended the plan to authorize an election by the participants to remain

---

[2] SEC. 402(a)(2) CAPITAL GAINS TREATMENT FOR CERTAIN DISTRIBUTIONS.—In the case of an employees' trust described in section 401(a), which is exempt from tax under section 501(a), if the total distributions payable with respect to any employee are paid to the distributee within 1 taxable year of the distributee on account of the employee's death or other separation from the service, or on account of the death of the employee after his separation from the service, the amount of such distribution, to the extent exceeding the amounts contributed by the employee (determined by applying section 72(f)), which employee contributions shall be reduced by any amounts theretofore distributed to him which were not includible in gross income, shall be considered a gain from the sale or exchange of a capital asset held for more than 6 months.

in the plan or to withdraw from it and receive a lump-sum distribution. Since the board believed that the reorganization would not entail a "separation from the service" by its employees, within the terms of the plan, but that it was such occasion as to allow an election to withdraw, it considered the amendment necessary to authorize the extraordinary distribution.

Election and distribution to the withdrawing employees followed within 4 months of the closing date under the reorganization agreement. We do not read the phrase "on account of" to require strict coincidence in time of the date upon which the right to the distribution accrues and the date of "separation." Accordingly, we view the distribution as having been made incident to and "on account of" the reorganization. Cf. *E. N. Funkhouser*, 44 T.C. 178, 184 (1965), affd. 375 F. 2d 1 (C.A. 4, 1967).

In reaching this conclusion, we disagree with petitioner's argument that there was no real assumption and continuance of the plan by Philco-Del. We attach little significance to the fact that Philco-Del did not contribute to the plan in 1961 and that in 1963 Ford established its standard stock-purchase plan for the Philco-Del employees. Under the terms of the plan, the Philco board of directors had the unfettered discretion to make any or no contribution to the trust according to the best interests of the corporation. No contribution was made in 1960, the year before the reorganization, because of low earnings, a condition which continued through 1961. There is no requirement under section 401(a) that the employer contribute every year, and the inference that there was no bona fide adoption of the plan by Philco-Del cannot be drawn because the suspension of contributions was motivated by "business necessity." Sec. 1.401–1(b)(2), Income Tax Regs. About half the participants remained in the plan after the distribution and continue to be subject to its provisions. Philco-Del's adoption of the plan was more than a mere "formality designed to give it a short breathing spell until it could consummate the mechanics of discontinuance." *Jack E. Schlegel*, 46 T.C. 706, 709 (1966).

This determination raises squarely the question as to whether the reorganization of the Philco Corp. resulted in an en masse "separation from the service" of its employees. It is well established that the transfer of a controlling interest in the stock of a corporation alone does not cause a "separation from the service." See *United States* v. *Johnson*, 331 F. 2d 943 (C.A. 5, 1964); *United States* v. *Martin*, 337 F. 2d 171 (C.A. 8, 1964); *Harry K. Oliphint*, 24 T.C. 744 (1955), affirmed per curiam on another point 234 F. 2d 699 (C.A. 5, 1956). On the other hand, two earlier decisions of this Court based upon section 165(b), I.R.C. 1939, held that when, pursuant to a corporate reorganization, all the assets and liabilities of one corporation are transferred to another and the transferor corporation is dissolved, the employees of the

transferor corporation are "separated from the service" of their employer as of the date of dissolution, even though there is no change in the management, policies, or personnel of the transferor corporation. *Mary Miller*, 22 T.C. 293 (1954), affirmed per curiam 226 F. 2d 618 (C.A. 6, 1955); *Lester B. Martin*, 26 T.C. 100 (1956). The rationale of these cases has been tacitly accepted in some cases as applicable to section 402(a)(2), e.g., *Jack E. Schlegel, supra; Rybacki v. Conley*, 340 F. 2d 944 (C.A. 2, 1965); *Thomas E. Judkins*, 31 T.C. 1022 (1959); but it has been seriously questioned by others, e.g., *United States v. Johnson, supra; United States v. Martin, supra; E. N. Funkhouser, supra*.

The "separation from the service" criterion of section 402(a)(2) must be applied on a case-by-case basis. We conclude on the facts of this case that the reorganization of the Philco Corp. did not cause petitioner's "separation from the service." The enactment of section 402(e)[3] of the 1954 Code and the legislative history relating thereto reflects the intent of Congress that, except in the year 1954, capital gains treatment should not be accorded to distributions spawned by "reorganizations which do not involve a substantial change in the make-up of employees." S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., p. 54 (1954). Moreover, as Judge Wisdom said in the majority opinion of the Court of Appeals for the Fifth Circuit in *United States v. Johnson*, 331 F. 2d at 949:

On its face, Section 402(e) seems to say that *after 1954* distributions will not qualify for capital-gain treatment if they are made as a result of the termination of a plan incident to a corporate reorganization, even if the corporate employer is completely liquidated. Apparently, Congress was willing to approve Miller for one year, for the benefit of the limited number of persons who acted in reliance on that decision. In other words, after 1954 a separation from service would occur only on the employee's death, retirement, resignation, or discharge; not when he continues on the same job for a different employer as a result of a liquidation, merger or consolidation of his former employer.

When viewed in this context, it is plain that "separation from the service" requires a change in the employment relationship in more than a formal or technical sense. The Court of Appeals in *Johnson* held that when one corporation purchases all the outstanding stock of a second corporation, then merges into the second corporation, there occurs a mere technical change in the employment relationship of the persons employed throughout by the surviving corporation. In the present case the first corporation (Ford) purchased all the assets and

---

[3] SEC. 402(e). CERTAIN PLAN TERMINATIONS.—For purposes of subsection (a)(2), distributions made after December 31, 1953, and before January 1, 1955, as a result of the complete termination of a stock bonus, pension, or profit-sharing plan of an employer which is a corporation, if the termination of the plan is incident to the complete liquidation, occurring before the date of enactment of this title, of the corporation, whether or not such liquidation is incident to a reorganization as defined in section 368(a), shall be considered to be distributions on account of separation from service.

liabilities of the second (Philco-Penn), then changed the second corporation's State of incorporation. In applying the provisions of section 402(a)(2) to these facts, we discern no meaningful distinction between the transfer of stock and the transfer of assets. We are left, then, with the question of whether, as to an employment relationship, a change in the employer's State of incorporation is one of form or substance.

In answering this question, we place great weight on the congressional intent to ignore reorganizations not involving a "substantial change in the make-up of employees." The employees of Philco-Penn became employees of Philco-Del in the same capacities simply by reporting to work on December 11, 1961. No substantial change was made in the supervisory personnel after that date. Petitioner worked in the same capacity under the same superiors both before and after the reorganization. Apparently, the only personnel change involved the selection of a new president and a new production manager. The facts of this case do not establish a "substantial change in the make-up of employees" to render petitioner's change in employment more than one in form only. Consequently, we conclude that there was no "separation from the service" which entitles petitioner to have his distribution taxed as a long-term capital gain under section 402(a)(2).[4] Since the distribution did not occur in 1954, section 402(e) is inapplicable, and petitioner must report the entire amount received in 1962 as ordinary income.

Since we have found that the instant distribution was made "on account of" the corporate reorganization,[5] we believe that the adoption of the plan by Philco-Del does not serve as a basis for distinguishing the rationale of the *Mary Miller* case.[6] Therefore, to the extent inconsistent with the result reached here, we consider the *Miller* case, as well as the *Lester B. Martin* case, to be abrogated by the provisions of

---

[4] See contra *Haggart* v. *Rockwood* (D. N. Dak. 1967, 20 A.F.T.R. 2d 5460, 67–2 U.S.T.C. par. 9629). For a general discussion see Nagel, "Capital Gains Treatment for Employees on Lump-Sum Distribution from Qualified Pension and Profit-Sharing Plans," 43 Taxes 403 (1965). See also Goodman, "How to Obtain Capital Gain Treatment on Distributions from Qualified Plans," 24 J. Taxation 76 (1966).

[5] Adoption of a profit-sharing plan by a transferee corporation has been a stated ground for disqualification under sec. 402(a)(2) only where the distribution was made subsequent to the transfer of assets and could not be said to "relate back" to the transfer. See and compare *Jack E. Schlegel*, 46 T.C. 706 (1966) ; *E. N. Funkhouser*, 44 T.C. 178 (1965) ; *Rybacki* v. *Conley*, 340 F. 2d 944 (C.A. 2, 1965) ; *Clarence F. Buckley*, 29 T.C. 455 (1957).

[6] We recognize that the Commissioner issued in 1958 a series of revenue rulings on the question of "separation from the service" as related to corporate acquisitions. See Rev. Ruls. 58–94, 58–95, 58–96, 58–97, 58–98, 58–99, 1958–1 C.B. 194–204. The revenue ruling most like this case is 58–94, where the assets and liabilities of the M corporation were transferred through the P corporation to its subsidiary S, in exchange for the stock of P. The employees' pension plan and trust of the M corporation were terminated and lump-sum distributions were made incident to the reorganization. The ruling held that the distributions were entitled to capital gains treatment. These rulings are discussed and severely criticized in *United States* v. *Johnson*, 331 F. 2d 943, 949–953 (C.A. 5, 1964). Petitioner does not rely on Rev. Rul. 58–94 ; nor does respondent disavow it.

the Internal Revenue Code of 1954. See the thorough treatment of this point in *United States* v. *Johnson, supra* at 946–949.

Reviewed by the Court.

*Decision will be entered for the respondent.*

---

TANNENWALD, *J.*, concurring: I think the majority has reached the right result for the wrong reason.

Contributions to the plan were discretionary with the original employer, Philco-Penn. The agreement with Ford provided that Ford would be furnished with "assignments of all pension, retirement, profit-sharing, bonus, and other welfare or benefit plans" of Philco-Penn and "evidence of such other corporate action by [Philco-Penn] as may be needed to place Ford in the position [Philco-Penn] now occupies under such plans" and that "Ford agrees to take appropriate action and to enter into appropriate argeements with respect to adoption of, amendment of, or substitution for such plans." Moreover, the agreement between Philco-Penn, Philco-Del, and the trustee of the plan provided that Philco-Del "shall succeed to all the rights and liabilities of [Philco-Penn] under the Trust Agreement." Philco-Penn by appropriate corporate action amended the plan to implement the foregoing and specifically provided in such amendment that the term "Philco Corporation" as used in the trust agreement should include Philco-Del. All of the foregoing antedated the closing of the transfer of the business of Philco-Penn to Philco-Del on December 11, 1961.

It seems to me that, by virtue of that closing, Philco-Del adopted the plan. By the terms of the plan, contributions were permitted but not required, and there is nothing in the record before us to indicate that the decision of Philco-Del in this regard had to be made before the end of 1962.[1] To be sure, Philco-Del in fact made no contributions to the plan but we have no way of determining on the record herein when the decision not to contribute was taken. For aught that appears, that decision may not have been made until well into 1962.[2]

Petitioner became an employee of Philco-Del at the time of the closing, to wit, December 11, 1961. He did not receive notice of his right to elect withdrawal of his share under the plan until January 1962 and did not exercise this right of election until later in that month. He was still an employee of Philco-Del at the time of actual distribution on March 31, 1962, and did not retire until June 30, 1965.

---

[1] The plan provided that contributions, if any, were to be made on account of the fiscal year of the corporation ending with or within the fiscal year of the plan and that the amount of any contribution was to be fixed prior to the close of the fiscal year of the corporation. The record indicates that the plan was on a calendar year but is silent as to the fiscal year of Philco-Penn or Philco-Del.

[2] On Dec. 7, 1961, Philco-Del wrote to all employees that Philco-Del had "no present plan to change [Philco-Penn's] retirement and pension plans."

Under the foregoing circumstances, I think this case falls squarely within the ambit of *Jack E. Schlegel*, 46 T.C. 706 (1966), and *E. N. Funkhouser*, 44 T.C. 178 (1965), affd. 375 F. 2d 1 (C.A. 4, 1967).

Even if petitioner's right to withdraw was fixed prior to the closing and therefore these two decisions are not controlling (see *Jack E. Schlegel, supra* at 709), the result herein should be the same. It cannot be gainsaid that petitioner separated from the service of Philco-Penn on December 11, 1961. But it does not follow that the distribution to him was "on account of" such separation. Petitioner had the option either to have his share distributed to him or remain under the plan. It was *his choice*, not his "separation from the service," which was the reason for the distribution. *E. N. Funkhouser*, 44 T.C. at 184–185.

For the foregoing reasons, it is, in my opinion, unnecessary to face, as the majority does, the question whether there is a conflict between section 402(a)(2) and *Mary Miller*, 22 T.C. 293 (1954), affirmed per curiam 226 F. 2d 618 (C.A. 6, 1955), and *Lester B. Martin*, 26 T.C. 100 (1956). As Judge Raum succinctly pointed out in *E. N. Funkhouser*, 44 T.C. at 184, those cases are "To be sharply distinguished" with respect to situations such as are involved herein.

I also think the majority's rationale that "separation from the service" under section 402(a)(2) requires a "substantial change in the make-up of employees" is incorrect.

When the "separation from the service" provision (sec. 165(b), I.R.C. 1939) was first introduced into the Revenue Act of 1942, the Senate Finance Committee explained that it was intended to cover a situation where an employee was entitled to be paid his total distributions in the year "in which he retires or severs his connection *with his employer*." (Emphasis added.) See S. Rept. No. 1631, 77th Cong., 2d Sess., p. 138 (1942). See also *Estate of Frank B. Fry*, 19 T.C. 461, 464 (1952), affirmed per curiam 205 F. 2d 517 (C.A. 3, 1953); *Edward Joseph Glinske, Jr.*, 17 T.C. 562, 565 (1951). In 1952, when the Congress amended section 165(b) to deal with the problem of appreciation of distributed securities of the employer corporation, the committee reports again emphasized "the employee's separation *from the employer's service*." (Emphasis added.) See H. Rept. No. 2181, 82d Cong., 2d Sess., p. 1 (1952); S. Rept. No. 1831, 82d Cong., 2d Sess., p. 1 (1952). When the proposed Internal Revenue Code of 1954 was first introduced and as it passed the House of Representatives, it contained sections 402(a)(2) and 402(a)(3)(B)(ii).[3] H.R.

---

[3] Sec. 402(a)(2) provided for capital gains treatment with respect to total distributions in 1 year "by reason of the termination of the plan as a result of the complete termination of the business of the employer." Sec. 402(a)(3)(B)(ii) provided as follows:

(ii) the term "complete termination of the business of the employer" means, in the case of an employer which is a corporation, the complete liquidation of such corporation whether or not such liquidation qualifies as a complete liquidation under section 336 and whether or not such liquidation is incident to a corporate acquisition of property, a statutory merger, or consolidation.

8300, 83d Cong., 2d Sess., pp. 97–98 (1954); H. Rept. No. 1337, 83d Cong., 2d Sess., p. A147 (1954). During the course of the hearings before the Senate Finance Committee, it was pointed out by the Association of the Bar of the City of New York that such a provision might lead to abuse in that there could be technical compliance with the provision even though the business was continued. See Hearings before the Committee on Finance, United States Senate, 83d Cong., 2d Sess., p. 572 (1954). The result was a more restrictive provision which, with minor changes in conference not material herein, became section 402(e) of the 1954 Code (see H. Rept. No. 2543, 83d Cong., 2d Sess. (1954)). In incorporating this provision, the Senate Finance Committee stated:

> The House bill extends capital gains treatment to lump-sum distributions to employees at the termination of a plan because of a complete liquidation of the business of the employer, such as a statutory merger, even though there is no separation from service. This was intended to cover, for example, the situation arising when a firm with a pension plan merges with another firm without a plan, and in the merger the pension plan of the first corporation is terminated.
>
> Your committee's bill revises this provision of the House bill to eliminate the possibility that reorganizations which do not involve a substantial change in the make-up of employees might be arranged merely to take advantage of the capital gains provision. Thus, your committee's bill would grant capital gains treatment to lump-sum distributions occurring in calendar year 1954 where the termination of the plan is due to corporate liquidation in a prior calendar year. The purpose of granting capital gains treatment to such distributions is to avoid hardship in the case of certain plans which it is understood were terminated on the basis of mistaken assumptions regarding the application of present law. [See S. Rept. No. 1622, 83d Cong., 2d Sess., p. 54 (1954).]

The majority, following the lead of Judge Wisdom in *United States v. Johnson*, 331 F. 2d 943 (C.A. 5, 1964), seizes upon the words "substantial change in the make-up of employees" to support its rationale. In so doing, the majority, in my opinion, misreads the report of the Senate Finance Committee. That report reflects a concern with changes in employment involving no realistic structural change in the employer, such as the liquidation of a subsidiary corporation into its parent and a continuation of the business and the employment relationship without any accompanying change in beneficial ownership. That this is the case is revealed by the language in the committee report referring to "a substantial change in the make-up of employees" which *"might be arranged merely to take advantage of the capital gains provision"* (emphasis added; see S. Rept. No. 1622, *supra*) and to the fact that section 402(a)(2) is by its terms directed toward the narrow area of corporate liquidations and not reorganizations generally.[4]

---

[4] The reference to "reorganizations" would seem to have been intended to make sure that a statutory merger of a subsidiary into a parent would still be considered a liquidation.

In effect, the majority unnecessarily and erroneously indicates that a change of employer accomplished as a part of a transfer of ownership can never be a "separation from the service" unless there is also a change in the makeup of the employee group—something that, in most transfers of businesses, is in fact unlikely to occur. Nothing in the legislative history requires such a rationale. Indeed, although section 402(e) may not have accomplished all that was originally intended by the House provision, I think it unwarranted, within the context of the total legislative history, to extend that section to situations beyond those involving modifications in corporate structures which bring about "a change in the employment relationship in no more than a formal or technical sense," i.e., unaccompanied by a meaningful change in the beneficial ownership of the business. See Rev. Rul. 58–94, 1958–1 C.B. 194, 196; Sellin, Taxation of Deferred Employee and Executive Compensation 368 (1960).

Concededly, the decided cases and rulings have a "bramble bush" character. See *Jack E. Schlegel, supra* at 708. *United States* v. *Johnson, supra,* and *United States* v. *Martin,* 337 F. 2d 171 (C.A. 8, 1964), are distinguishable on their facts since, in those cases, the taxpayer remained as an employee of the same entity after the transfer of ownership. The same can be said of *United States* v. *Peebles,* 331 F. 2d 955 (C.A. 5, 1964); language in the opinion in that case indicating that the identity of the employer was an immaterial consideration is pure dicta and, I think, wrong.[5] Perhaps some language in the opinions in *Mary Miller, supra,* and *Lester B. Martin, supra,* can be construed to permit capital gains treatment of distributions where there is only a formal or technical change in the employment relationship; if so, I think such a construction should not be followed.

A whole series of rulings by respondent reflects the rationale that change of employer *plus* meaningful change of beneficial ownership is sufficient to constitute "separation from the service" and that, if these two conditions are met, a "substantial change in the make-up of employees" is not a prerequisite. Rev. Rul. 58–94, 1958–1 C.B. 194; Rev. Rul. 58–95, 1958–1 C.B. 197; Rev. Rul. 58–96, 1958–1 C.B. 200; Rev. Rul. 58–97, 1958–1 C.B. 201; Rev. Rul. 58–98, 1958–1 C.B. 202; Rev. Rul. 58–99, 1958–1 C.B. 202; Rev. Rul. 58–383, 1958–2 C.B. 149. Even if the discernible pattern of legislative history is not as clear as I think it is, these rulings constitute a contemporaneous construction of what is at best an unclear statutory provision, the interpretation of which is controversial. See *Funkhouser* v. *Commissioner,* 375 F. 2d 1, 5 (C.A. 4, 1967). Particularly since respondent at no point herein seeks to disavow these rulings, they should be accorded substantial weight.

---

[5] The Fifth Circuit Court of Appeals recognized that the taxpayer was on the payroll of the subsidiary corporation prior to the transfer of stock ownership, but, because of its approach, found it unnecessary to question the District Court's finding that the taxpayer was an employee of the parent corporation prior to the transfer.

Cf. *Hanover Bank* v. *Commissioner*, 369 U.S. 672 (1962). Under these circumstances, I simply do not understand their gratuitous rejection by the majority.

In the area of section 402 (a) (2), taxpayers are sufficiently victims of decisions over which they have no control. See *Jack E. Schlegel, supra* at 710. I see no justification for adding to their misery.

RAUM, *J.*, agrees with this concurring opinion.

---

FEATHERSTON, *J.*, concurring: While I agree with the majority that petitioner was not "separated from the service" within the meaning of section 402, I do not believe this conclusion requires us to sweep aside the now existing precedents on which taxpayers and the Service have relied. I would hold merely that since Philco-Del succeeded to all the rights and liabilities of Philco-Penn under the trust agreement, and petitioner remained in the employ of Philco-Del, there was no "separation from the service" as required under section 402 (a) (2). *E. N. Funkhouser,* 44 T.C. 178, 184 (1965), affd. 375 F. 2d 1 (C.A. 4, 1967).

DRENNEN, RAUM, and SCOTT, *JJ.*, agree with this concurring opinion.