UNITED STATES of America,
Appellant,

v.

Ophelia JOHNSON and Ophelia R. John-son, as Executrix under the Last Will and Testament of Clifford L. Johnson, Deceased, Appellees.

No. 20500.

United States Court of Appeals
Fifth Circuit.

May 6, 1964.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Atty., Dept. of Justice, Washington, D. C., Vernol R. Jansen, Jr., U. S. Atty., Mobile, Ala., David O. Walter, Ralph A. Muoio, Attys., Dept. of Justice, Washington, D. C., John W. Mobley, Asst. U. S. Atty., for appellant.

Vincent F. Kilborn, Mobile, Ala., for appellees.

Before RIVES, WISDOM and GEWIN, Circuit Judges.

WISDOM, Circuit Judge.

The problem this tax case presents results from the termination of an employee retirement plan incident to a change of stock ownership of the corporate employer. Section 402(a) (2) of the Internal Revenue Code of 1954 provides that a lump-sum distribution from a qualified employees' trust will be treated as a capital gain, if the distribution is paid "on account of the employee's death or other separation from the service of his employer.[1] Congressional reti-

1. Section 402(a) (2) provides: "Capital gains treatment for certain distributions. —In the case of an employees' trust described in section 401(a), which is exempt from tax under section 501(a), if the total distributions payable with respect to any employee are paid to the distributee within 1 year of the distributee on account of the *employee's death or other separation from the service,* or on account of the death of the employee after his separation from the service, the amount of such distribution, to the extent exceeding the amounts con-

cence on the effect of termination of employee trusts;[2] certain Janus-like Internal Revenue rulings on which both parties rely,[3] and a conflict in the cases [4] complicate the problem.

The Government contends that the distribution must be treated as ordinary income under Section 401(a) (1), because the distribution was on account of termination of the plan and not on account of "separation from the service" of the employer. The taxpayer contends that the change in ownership of the stock, resulting in the new management's termination of the plan, was a change of employers tantamount to "separation from the service". The district court, relying principally on Thomas E. Judkins, 1959, 31 T.C. 1022, held for the taxpayer.[5] We reverse.

## I.

### The Facts Are Not Disputed

January 1, 1945, the Waterman Steamship Corporation established a noncontributory retirement plan for its employees and the employees of certain participating subsidiary corporations. The plan was a qualified employees' trust under Section 401(a) and was tax-exempt under Section 501(a) of the Internal Revenue Code of 1954.

May 5, 1955, C. Lee Company, Incorporated, a wholly owned subsidiary of McLean Securities Corporation, purchased over 99 per cent of the outstanding stock of Waterman. On the same day, a newly elected board of directors voted to terminate the plan subject to a favorable ruling by the Internal Revenue Service. *By stipulation of the parties,*

tributed by the employee (determined by applying section 72(f), which employee contributions shall be reduced by any amounts theretofore distributed to him which were not includable in gross income, shall be considered a gain from the sale or exchange of a capital asset held for more than 6 months. Where such total distributions include securities of the employer corporation, there shall be excluded from such excess the net unrealized appreciation attributable to that part of the total distributions which consists of the securities of the employer corporation so distributed. The amount of such net unrealized appreciation and the resulting adjustments to basis of the securities of the employer corporation so distributed shall be determined in accordance with regulations prescribed by the Secretary or his delegate."

2. One leading authority has said: "The whole matter of capital gains for pension-trust termination, for example, started with an error in judgment on the Treasury's part in 1942 when it acquiesced in capital-gain treatment as a solution for the bunched-income problem present in this area. It so happened that the problem was presented in the context of a pension trust in which only the lower-bracket taxpayers received lump sum distributions, and as an ad hoc solution the result was not too objectionable. But there was a failure to think through the problem, a failure caused by lack of time and lack of knowledge about the provisions respecting termination of pen-

sion trusts. Thus the provision got its start—and the rule of the camel's nose is cardinal in the field of tax privileges." Surrey, The Congress and the Tax Lobbyist—How Special Provisions Get Enacted, 70 Harv.L.Rev. 1145, 1161 (1957).

See also Miller, Capital Gains Taxation of the Fruits of Personal Effort: Before and Under the 1954 Code, 64 Yale L.J. 1, 5 (1954); Eckerman, The Unrationalized Capital Gains Treatment of Lump-Sum Termination Distributions from Qualified Pension, Profit-Sharing and Annuity Plans, 7 Syracuse L.Rev. 1 (1955); Sporn, Taxation of Deferred Compensation Arrangements, 14 Tex.L.Rev. 289, 303–307 (1959); Bushman and Buchanon.

3. Rev.Rul. 58–94, 1958–1 Cum.Bull. 194; Rev.Rul. 58–95, 1958–1 Cum.Bull. 197; Rev.Rul. 58–96, 1958–1 Cum.Bull. 200; Rev.Rul. 58–97, 1958–1 Cum.Bull. 201; Rev.Rul. 58–98, 1958–1 Cum.Bull. 202; Rev.Rul. 58–383, 1958–2 Cum.Bull. 149.

4. Two recent cases are in direct conflict: Nelson v. United States, D.C.Idaho, Sept. 23, 1963, 227 F.Supp. 712; Martin v. United States, D.C.Minn., 229 F.Supp. 549.

5. The district court reached the same conclusion in a companion case, Peebles v. United States, 208 F.Supp. 385. We have also reversed the judgment in that case. In reaching a decision we have considered the briefs and arguments as if the two cases were consolidated on appeal.

*May 5, 1955, is the date the plan was terminated.*

By letter, July 26, 1955, the Service ruled that the proposed termination of the plan would not affect its tax-exempt status. The letter stated that the Service agreed with the trustee that lump sum distributions upon termination of the plan would be taxable as ordinary income. Waterman relayed this information to its employees.

August 1, 1955, the taxpayer, a machinist foreman, received a lump sum payment of $12,593.43, representing the balance standing to his credit as of the date of termination of the plan. The Government claims a deficiency of $1,644.25. After the termination of the plan the taxpayer continued in Waterman's employ in his same job.

December 22, 1955, Lee merged into Waterman. Waterman was the continuing corporation.

## II.

### The 1939 Code

Before 1942, all payments from an employees' trust were subject to ordinary income tax rates, even though paid to a distributee in one taxable year. See Section 165, Internal Revenue Code of 1939, 26 U.S.C.A. § 165 (1952 ed.), the predecessor of Section 402(a) (2). Section 162(a) of the Revenue Act of 1942 (C. 619, 56 Stat. 798) introduced capital gains treatment of lump-sum payments from employees' trusts. This came in the form of an exception added by the Senate as an amendment to Section 165 (b): if on account of the employee's "separation from the service" of his employer the distributee receives lump-sum payments, the amount received (less the employee's contributions) may be treated as a long-term capital gain.[6] The Senate's explanation was skimpy. The committee report explains only that the exception applies when the employee *"retires or severs his connection with his employer"*.[7] The statute, unlike the 1954 Code, is "silent as to any distinction * * * between distributions on account of a 'separation from the service' of an employer and distributions as a result of 'the complete termination of' the plan of an employer." [8]

The first two cases decided under the 1942 amendment to Section 165, in line with the Senate report, took "separation from the service" to mean a clean severance of the employment relationship. The Tax Court disallowed capital gains

---

6. Sec. 165. Employees' Trusts.
   "(b) Taxability of beneficiary. The amount actually distributed or made available to any distributee by any such trust shall be taxable to him, in the year in which so distributed or made available, under section 22 (b) (2) as if it were an annuity the consideration for which is the amounts contributed by the employee, except that if the total distributions payable with respect to any employee are paid to the distributee within one taxable year of the distributee *on account of the employee's separation from the service*, the amount of such distribution to the extent exceeding the amount contributed by the employee, shall be considered a gain from the sale or exchange of a capital asset held for more than 6 months. * * * *" (Emphasis added.)

7. "The provisions of the House bill with respect to section 165(b), concerning the taxation of the beneficiary of a trust which meets the requirements of section 165(a), have not been changed except to take care of the situation where an employee receives the total distributions that he is entitled to under the plan in one taxable year *on account of his separation from the service*. In such a case, it is provided that the amount of such distributions to the extent that it exceeds the amounts contributed by the employee shall be considered a gain from the sale or exchange of a capital asset held for more than six months. For example, if under a profit-sharing trust, the total distributions to which an employee is entitled are paid to the employee in the year in which he retires or *severs his connection with his employer*, or to his widow if he dies during the course of his employment, the amount received by the employee or widow to the extent it exceeds the employee's contributions will be considered a gain from the sale or exchange of a capital asset held for more than six months." (Emphasis added.) Sen.Rep.No.1631, 77th Cong., 2d Sess. 1942, p. 138 (1942 Cum.Bull. 504, 607.)

8. Rev.Rul. 59–94, 1958 Cum.Bull. 194, 196.

treatment when the distributions appeared to have been made because of termination of the plan and not because of severance of employment. In E. J. Glinske, 1951, 17 T.C. 562, the corporate employer sold all of its assets, including the use of its name, and went out of business. The taxpayer continued in the employ of the purchaser. Three weeks after the purchase, the acquiring corporation terminated the employees' pension trust. The taxpayer having continued in the employ of the same corporate employer, the Tax Court held for the Government: " 'on account of the employee's separation from the service' means that the distributions were made on account of the employee's separation from the service of *his employer*". 17 T.C. at 565. In Estate of Fry, 1952, 19 T.C. 461, affirmed 3 Cir. 1953, 205 F.2d 517, the taxpayer received a lump-sum payment from an employees' trust when he reached retirement age, but continued to receive his regular compensation for two years. The Tax Court found:

> "In order to obtain the benefits permitted under section 165(b) of the Internal Revenue Code, the decedent must have been retired or *severed his connection with his employer* within the year in which he received the lump sum settlement of his rights under the pension fund." 19 T.C. at 464. (Emphasis added.)

See also James H. Gordon, 1956, 26 T.C. 763, Clarence H. Buckley, 1957, 29 T.C. 455, and McGowan v. United States, E.D. Wis.1959, 175 F.Supp. 364, affirmed 7 Cir. 1960, 277 F.2d 613, which distinguish between distributions on separation from service and distributions on mere termination of the plan.

Mary Miller, 1954, 22 T.C. 293, affirmed per curiam 6 Cir. 1955, 226 F.2d 618, marks a significant development in the tax treatment of lump-sum payments from employees' trusts. This decision was the first to hold that payments incident to a change of employers are "on account of separation from the service". The taxpayer's employer, Strouss-Hirshberg Company, May 10, 1948, transferred all its assets and business to the May Company in exchange for stock. Officials of Strouss-Hirshberg, having anticipated that as a result of selling the business the corporation would be dissolved, terminated the retirement fund. Three days after the sale Strouss-Hirshberg was dissolved. There was no change in the name, management, policies, or personnel of the transferor company; after the transfer the taxpayer continued in his same job, but worked for a new employer. The Tax Court held:

> "The phrase 'separation from the service' means separation from the service of 'his employer,' Edward Joseph Glinske, Jr., 17 T.C. 562, 565. On May 10, 1948, petitioners became the employees of the May Company and were not paid for their services thereafter by the Strouss-Hirshberg Company. We have no difficulty in finding that *petitioners, on that day, had severed connections with their former employer* and that there had been a 'separation from the service' of that employer. Furthermore, *on that day they became eligible to receive distribution of their shares under the terms of the Trust Agreement because of their termination of service* with the Corporation. The actions to dissolve the Corporation and to terminate the fund in no way affected petitioners' rights at that time to receive their distributive shares of the fund. * * * The situation is therefore one where petitioners' rights to receive distributions of their shares of the fund arose 'on account of' their separation from the service of their employer, but the actual equivalent distribution of those shares was made in the course of terminating the fund." (Emphasis added.)

In Harry K. Oliphint, 1955, 24 T.C. 744, affirmed on another point, 5 Cir., 234 F.2d 699, the taxpayer contended that a change in stock ownership of a corporate employer, resulting in termination of its non-exempt profit-sharing

plan, amounted to his separation from the service of his employer. The principal holding was that Section 165(b) did not apply to a non-exempt trust. The court, however, made this alternative holding:

> "Furthermore, it is clear from the stipulated facts that Harry [the taxpayer] was not separated from the service of his employer within the meaning of section 165(b). * * * There is nothing in the record to show when, if ever, Harry ceased to render services to and severed his connection with the original corporate employer."

Oliphint in effect declared, as the Government contends here, that a change of stock ownership in itself is not a change of employers and therefore does not constitute separation from service.

In Lester B. Martin, 1956, 26 T.C. 100, Sperry Corporation acquired all of the stock of Dellinger Manufacturing Company for cash and operated it as a subsidiary for about six months. Dellinger was then liquidated and all of its assets transferred to Sperry. Sperry terminated Dellinger's pension plan. In due time Dellinger was dissolved. The Tax Court held:

> "[The] liquidation of Dellinger on April 1, 1949, resulted in a mass termination of the services of its employees. At that time petitioner's rights under the plan were fixed. * * * Here, as in Mary Miller, the petitioner's rights arose on account of his separation from the service of his employer. Payment under his rights was made only in the course of termination of the fund."

The Commissioner of Internal Revenue acquiesced in both Mary Miller and Lester B. Martin and these decisions furnish the major decisional source of the rationale for the 1958 revenue rulings to which we have referred. They were relied on in Judkins and by the court below. The taxpayer sees these cases as based on a change of ownership of "the business"; the Government sees them as based on mass severance of the employment relationship caused by the disappearance of the corporate entity. In both cases the business, employees and all, was maintained as a continuing, integrated whole, but the original employer disappeared; both corporate transferors were liquidated and dissolved. The court found that the distributions were "on account of separation from the service": in Mary Miller the separation took effect on the day the employees *"severed connections* with their former [transferor] employer" and began receiving their pay from a new employer; in Lester B. Martin the separation took place when the former employer was *liquidated, not when the stock was sold.* Oliphint accents these decisions by declaring that a change of stock ownership does not amount to separation from service.

## III.

### The 1954 Code

Partly because of doubt as to the reach of Miller, many questions on the effect of liquidation and merger on employees' trusts were wide open [9] when in 1954 Congress set about reforming the Internal Revenue Code. Congress rewrote Section 165(b) as new Section 402(a)(2),[10] unfortunately, again without rationalizing the special capital-gain treatment of lump-sum distributions from employees' trust. Unlike Section 165(b) of the 1939 Code, Section 402 of the 1954 Code differentiates between distributions on account of a "separation from the service" of an employer (Section 402(a)(2)) and distributions as a result of "the complete termination" of the plan of an employer, at least where the employer is a corporation (Section 402(e)).

The House draft of Section 402 had liberalized the grant of capital-gain treatment by expanding it prospectively to distributions when plans are terminated "as a result of the *complete ter-*

---

9. Miller but not Lester B. Martin or Oliphint had been decided.

10. See footnote 1.

*mination of the business* of the employer." This was defined to mean, "in the case of an employer which is a corporation, the complete liquidation of such corporation whether or not such liquidation qualifies as a complete liquidation under Section 336 and *whether or not such liquidation is incident to a corporate acquisition of property, a statutory merger, or consolidation"*. The House intended this provision to allow capital-gain treatment to situations such as arise upon the merger of a company having a plan with another company not having a plan, resulting in termination of the plan. H.R.Rep.No. 1337, 3 U.S.Code Cong. & Ad.News, 83rd Cong., 2d Sess.1954, pp. 4285–4286. The Senate Committee on Finance, fearing that the exception would lead to abuse, in that small corporations could be dissolved and reincorporated every few years to withdraw funds in plans as capital gains, amended the House proposal by limiting the application of Section 402(a) (2) in two ways. First, by Section 402(e), the Senate version provided that distributions on termination of a plan incident to the complete liquidation of a corporate employer shall "be considered to be distributions on account of separation from service" of the employer—but *only if made* during 1954. Second, to qualify under Section 402(e), the termination of the plan must be incident to *"a complete liquidation"* of the corporate employer, whether or not the liquidation is incident to a reorganization as defined in Section 368. For purposes of Section 402(e), the Senate Report defined "complete liquidation" as the *"disappearance of the corporate entity* by reason of the merger or consolidation of such corporation with another corporation". S.Rep. No.1622, 83rd Cong. 2nd Sess. p. 289; 3 U.S.C.Cong. & Adm. News, pp. 4621, 4928 (1954). The legislative history therefore shows a manifest congressional intent to distinguish between termina-

tion of the corporate entity of the employer as opposed to mere termination of the plan, which is not a separation from the service.

The Finance Committee explained its reasons as follows:

"The House bill extends capital gains treatment to lump-sum distributions to employees at the termination of a plan because of a complete liquidation of the business of the employer, such as a statutory merger, *even though there is no separation from service.* This was intended to cover, for example, the situation arising when a firm with a pension plan merges with another firm without a plan, and in the merger the pension plan of the first corporation is terminated.

"Your committee's bill revises this provision of the House bill to eliminate the possibility that reorganizations *which do not involve a substantial change in the make-up of employees* might be arranged merely to take advantage of the capital gains provision. Thus, your committee's bill would grant capital gains treatment to lump-sum distributions occurring in calendar year 1954 where the termination of the plan is due to corporate liquidation in a prior calendar year. The purpose of granting capital gains treatment to such distributions is to avoid hardship in the case of certain plans which it is understood were terminated on the basis of mistaken assumptions regarding the application of present law." Sen.Rep. No.1622, 83rd Cong., 2nd Sess., 54, 3 U.S.C. Cong. & Adm.News, pp. 4621, 4685 (1954). Emphasis added.)

The Senate amendment was accepted. The limited extension became Section 402 (e) of the Internal Revenue Code of 1954.[11] Conference Rep., H.R.Rep.No.

11. "(e) Certain plan terminations.—For purposes of subsection (a) (2), distributions made after December 31, 1953, and before January 1, 1955, as a result of the complete termination of a stock bonus, pension, or profit-sharing plan of an employer which is a corporation, if the termination of the plan is incident to the

2543, 3 U.S.Code Cong. & Ad.News, 83rd Cong., 2d Sess.1954, p. 5302.

Considering the codal language in the light of its background, Section 402 gives no aid and comfort to the taxpayer now before us. On its face, Section 402(e) seems to say that *after 1954* distributions will not qualify for capital-gain treatment if they are made as a result of the termination of a plan incident to a corporate reorganization, even if the corporate employer is completely liquidated. Apparently, Congress was willing to approve Miller for one year, for the benefit of the limited number of persons who acted in reliance on that decision. In other words, after 1954 a separation from service would occur only on the employee's death, retirement, resignation, or discharge; not when he continues on the same job for a different employer as a result of a liquidation, merger or consolidation of his former employer. Section 402(a) (2) says nothing about corporate liquidations and reorganizations and seems to contemplate a distribution when a single employee "dies or severs his employment". In any event, as the Senate Committee has said, there is no separation from service incident to any "reorganizations [even complete liquidations] which do not involve a substantial change in the make-up of employees". This authoritative construction focuses on termination of employment. And nowhere in the statutory language or in the legislative history can be found any intimation that a change of control and stock ownership is to be equated with the disappearance of the corporate entity in a complete liquidation or merger—or is tantamount to separation from service.

For aid and comfort, the taxpayer is compelled to resort to the rulings of the Internal Revenue Service. Surprising-ly, the Service has given him a helping hand.

## IV.

### The 1958 Internal Revenue Rulings

In spite of Section 402(e), the Internal Revenue Service has ruled that distributions on termination of a plan incident to a liquidation or reorganization of a corporation *after 1954* will qualify for capital gains treatment under Section 402(a) (2), if the distributions were made on account of "separation from the service". Rev.Rul. 58–95, 1958–1 Cum.Bull. 197. That ruling and certain related rulings undertook to clarify the concept of "separation from the service".

The basic position of the Service may be rationalized. A separation from service occurs when a single employee dies or severs his employment. Similarly, a mass severance may occur at one time as to all employees when, for example, the corporate entity disappears or there is a change of employers. The necessary premise, that "separation from service" means termination of employment, is supported by legislative history. The break in the employment relationship on a mass scale meets the congressional requirement of "a substantial change in the make-up of employees". This can take place when the employer is completely liquidated or merged into another corporation. But the legislative "history makes it plain that a corporate liquidation or reorganization which brings about a change in employment relationship in no more than a formal or technical sense, and which does not involve a *substantial change in the make-up of employees*, is not enough to constitute 'a separation from the service' under Section 402(a) (2)". Rev.Rul. 58–94, 58–1 Cum.Bull. 196.

Accordingly, the Service has ruled that an employee is considered to have sepa-

complete liquidation, occurring before the date of enactment of this title, of the corporation, whether or not such liquidation is incident to a reorganization as de-

fined in section 368(a), shall be considered to be distributions on account of separation from service." (26 U.S.C. 1958 ed., Sec. 402.)

rated from the service of his employer in the following situations.[12]

(1) Corporation A in a Section 368 reorganization transfers for stock all of its assets and liabilities to Corporation B which in turn transfers the assets and liabilities to its wholly owned subsidiary Corporation C, the taxpayer becoming an employee of Corporation C. (Rev.Rul. 58–94, Cum. Bull. 58–1, 194.)

(2) Corporation A sells all of its stock for cash to Corporation B which completely liquidates Corporation A and takes over all of Corporation A's assets. (Rev.Rul. 58–95, Cum.Bull. 58–1, 197.)

(3) Corporation A, incident to complete liquidation, sells all of its assets to Corporation B. (Rev.Rul. 58–96, Cum.Bull. 58–1, 200.)

(4) Corporation A, incident to a complete liquidation of Corporation A, sells the assets used in carrying on a division of Corporation A to unrelated Corporation B, the division employees going to work for Corporation B. (Rev.Rul. 58–97, Cum.Bull. 1958–1, 201.)

(5) A corporation, incident to liquidation and dissolution, sells all of its assets to a partnership composed of two former stockholder-employees. (Rev.Rul. 58–98, Cum.Bull. 1958–1, 202.)

(6) Corporation A, incident to a Section 368 reorganization involving a statutory merger, sells all of its assets to unrelated Corporation B. (Rev.Rul. 58–383, Cum.Bull. 1958–2, 149.)

On the other hand, the Service has ruled that no separation occurs when Corporation A sells all of its stock to unrelated persons, the employees remaining in Corporation A's employ but receiving lump-sum distributions on termination of a plan established by Corporation B, Corporation A's parent corporation. (Rev.Rul. 58–99, Cum.Bull. 1958–1, 202.)

The rulings have been severely criticized. "The artificial favoritism of the special tax treatment * * * is emphasized by the arbitrariness of the circumstances under which it is available. * * * As a group these Rulings * * * present the anomalous situation of the Service laboring diligently to police the availability of special tax advantages which the Service itself has made more generous than the statute furnishes any warranty for providing."[13] Yet the same critic writes "And yet the results are all probably defensible, if not imperative, under the present statute."[14] Another writes: "In the case of the group separations, if Congress had meant termination of employment it should not have used the term 'separation from the service'. * * * Mr. Fry and his brethren were extreme cases, and undoubtedly the right result was reached. The Service has rationalized these cases far beyond their facts in its desire, assumedly, to prevent abuses. The latest indications are that the present position of the Service is that here also [in group separation cases as well as in Fry-type cases] *separation from the service means termination of employment.*"[15]

Part of the difficulty, which the taxpayer seized upon in this case and in Ben Martin, is that the rulings are sometimes couched in cryptic, backhanded language which emphasizes change of ownership of a corporation at the expense of the concept of termination of employment. As the court said in Ben Martin, "The

---

12. See 4 Mertens, Law of Federal Income Taxation, Section 25B.52 (1960); Robbins, Effect of Corporate Reorganizations on Pension and Profit Sharing Plans, N.Y.U. 17th Inst. on Fed.Tax 951 (1959).

13. Sporn, Taxation of Deferred Compensation Arrangements, 14 Tax L.Rev. 289, 306, 307 (1959).

14. Ibid. at 307.

15. Bushman and Buchanon, Separation from the Service, 47 Am.B.Ass'n J. 831, 833 (1961).

Government * * * cannot avoid a series of Revenue Rulings finding a separation from service where there has been a substantial change in the ownership of the corporation." The difficulty is compounded by the Service's insistence that employees of corporate employers must be treated on the same basis as employees of non-corporate employers. This notion undermines the Government's position and is unsupported by statutory language or legislative history.

Revenue Ruling 58–94, 1958–1 Cum. Bull. 194 set the pattern. After thoroughly and clearly reciting the legislative history, this ruling states:

"It is nevertheless the position of the Internal Revenue Service that Congress did not intend in Section 402 to discriminate against the employees of a corporate employer by extending to them less favorable treatment than would be accorded under Section 402(a) (2) in cases involving separation from the service of a noncorporate employer." Rev. Rul. 58–94, 1958–1 Cum.Bull. 194, 196.

This seems to emphasize formal ownership, not termination of employment. Continuing, the ruling apologizes for giving effect to the substantial change that occurs when the corporate entity disappears:

"There is as real a change in the ownership of the business in the instant cases [the facts are similar to the facts in Mary Miller] as if the employer had not been a corporation and the fact that there is a sufficient continuity of interest to allow the transaction to be treated as a tax-free reorganization under Section 361(a) and 368(a) (1) (C) of the Code, so far as concerns the employer corporation and its stockholders, should not prevent viewing it as involving a separation from service for the purposes of Section 402(a) (2) as to the affected employees." Ibid. at 197.

In other rulings there are variations on this theme. Notwithstanding the Service's genuflections in the direction of "substantial change", the rulings never let on as to how much change is substantial.

The statement that for the purpose of Section 402(a) (2) employees of corporate employers must not be treated differently from employees of non-corporate employers cannot be taken literally. The existence of the corporate cloak bears directly on whether there is the "disappearance of the corporate entity" contemplated in the Senate Report. The very purpose of using the corporate form in business is to attain immortality; a bare change in stock ownership cannot affect the corporate existence. "Our system of taxation like our general law is, of course, based primarily on treating the corporation as a separate person, irrespective of the number of stockholders. On acceptance of this generally recognized fiction, the whole elaborate structure of corporation income tax, excess profits tax, capital stock tax, declared value excess profits tax, and the taxation of corporate dividends, is based." Cleary, The Corporate Entity in Tax Cases, 1 Tax L.Rev. 3, 4; 7 Tax Couns.Q. 351, 355 (1963). This Court has looked through form to substance in tax cases, but only in unusual situations or in circumstances fully spelled out by Congress.

Congress limited the concept of "separation from service" because it feared that *corporate* taxpayers would abuse the law. The specific mischief Congress feared was the possibility that there might be a technical disappearance of a corporate entity in a tax-free reorganization not involving "a substantial change in the make-up of employees". It made no difference to Congress which way directors walked around the table, but they could not walk in a direction leading to abuse of the law and expect to receive favored treatment. The mischief *does* not exist when the termination of the plan is incident to a bona fide complete liquidation. It may exist

when there is only a change of stock ownership. Where there is only a change of stock ownership and the business continues with the same employees in the same jobs it seems reasonable to say that there is not such "a substantial change in the make-up of employees" as Congress apparently contemplated as a predicate for employees receiving favored tax treatment. A strong inference must be drawn in favor of the Government's position from the definitiveness of the terms used by Congress to describe separation of service: (1) *"death or other separation"* (2) *"complete liquidation"*, (3) *merger resulting in the "disappearance" of the original corporate entity*, (4) *"retire or sever"*.

## V.

### Recent Decisions

The two 1963 district court decisions on the point at issue take opposite approaches to the rulings.

Martin v. United States, D.C.Minn., 229 F.Supp. 549, involved the identical employees' retirement plan and Waterman transactions which are involved in the case before this Court. The district judge, after an extensive review of the rulings and their background, concluded that the Government was stuck with them: "The Government, however, cannot disregard the development since 1954. If this development has been confused, the Government's own Rulings have contributed to the confusion". In holding for the taxpayer, the court said:

"The Government's position would be stronger if it could point to a consistent record of interpreting separation from service as meaning a termination of employment. It does not have such a record. * * * If Waterman had merged into Lee and Lee had been the continuing corporation, there would have been a separation from the service of Waterman on the part of taxpayer. The Government apparently concedes as much. *Why should it make any difference here which way the McLean directors walked around the table?* * * * If we are to follow the authority holding a transfer of ownership a separation from service, we should not be put off by the form of the transaction, but make our decision on the basis of genuine transfers of ownership. *If we are to reject this authority, the rejection should be based on an interpretation of the statute rather than on a distinction based on a corporate formality."* (Emphasis added.)

The court devoted most of its opinion to the rulings. The reasoning in Ben Martin is unpersuasive when the court turns to the statute. The court takes "on account of", properly enough, to denote a causal relationship between the distribution and separation from service. Then, "assuming that a change of corporate ownership is a separation from service * * * the requisite causal relationship [was] present". This assumption begs the question.

The last sentence of the quotation from Ben Martin describes the approach taken in Nelson v. United States, D.C.Idaho, 222 F.Supp. 712: "The answer to the question posed in this law suit depends upon the interpretation and meaning of Section 402(a) (2)." The facts in Nelson are essentially similar to the facts in the instant case. The Insurance Commissioner of Idaho, as receiver, took over all of the assets and stock of the Lincoln National Insurance Company. He sold virtually all of the stock to persons not the original shareholders, 38,-377 shares of 60,000 shares to one person. After the reorganization, the new directors and officers terminated the retirement plan. As in the instant case, the corporation was never liquidated, never dissolved, and the taxpayers remained employees of the original corporation after the trust fund was distributed. The opinion referred to the instant case and its companion case, Peebles v. United States, discussed Judkins, Miller, and Martin, and cited Glinske and McGowan, but referred to

the rulings only once and then indirectly. In holding for the Government, the court said:

"The Court's function is to give effect to the intent of Congress. An examination of section 402 reveals that it was not the intention of Congress to give long term capital gain treatment to every lump sum distribution of an entire interest in a pension trust fund when such distribution has been made solely because the plan is terminated. It is clear that such treatment is to be accorded only when there has been a separation from the service of the employer. Glinske v. Commissioner, (1952) 17 T.C. 562.

"In attempting to determine when there is a separation from service the court must look to the phrase 'on account of the employee's death or other separation from the service.' A reasonable interpretation of this language is that the employee must be separated from the service of his employer *either because of the employee's death or for reasons equally definite and certain.* Here taxpayers never ceased to be employees of their corporate employer, Liberty National Insurance Company, even though the management and control of the corporation did change. A corporation is an entity separate and distinct from its individual shareholders and the person managing and controlling it.

" * * * No change in taxpayers' employment occurred because the corporate entity continued to exist and they continued to be employed by it. The fact that this reorganization was involuntary in the sense that shareholders, officers, and directors may not have given their express assent is immaterial because a voluntary reorganization would not have resulted in the creation of a new corporate employer. * * * *Distribution was made to the taxpayers on account of termination of the pension trust and*

*not on account of separation from service.*" (Emphasis added.)

We go along with this interpretation of the congressional mandate. To the extent that the glosses of the Internal Revenue Service disagree, we think that the rulings are in error.

We turn now to Judkins, a frail reed. That case also involved the Waterman plan. The Tax Court held that the lump-sum payment to Judkins qualified for capital gains treatment. The court leaned heavily on Miller and Lester B. Martin and the revenue rulings cited in this opinion. But as the Nelson court pointed out in its discussion of Judkins:

"In the Miller and [Lester B.] Martin cases the employer corporation that initiated the pension plan was first liquidated by transfer of its assets to a purchasing corporation and then dissolved. In both cases the taxpayers were thereafter employed by the purchasing corporation, a new employer, in the same job. Those cases do not support what the taxpayers contend was the Tax Court's holding in the Judkins case."

Judkins is based in part, as the court held, on "an actual termination of petitioner's employment with his employer". 31 T.C. at 1029. Judkins was discharged June 1, 1955. The court found that on June 1, 1955, the plan "had not definitely been terminated". (This finding is in the teeth of the parties' stipulation that the plan was terminated May 5, 1955.) On that finding, the distribution to Judkins could be said to meet the statutory test as a payment on separation from service. See McGowan v. United States, 7 Cir. 1960, 277 F.2d 613, 615, affirming D.C., 175 F.Supp. 364. In line with this view, the Internal Revenue Service acquiesced in Judkins but limited its acquiescence to instances where the employee's service with the employer was severed before the effective date of termination of the plan. We point out that, under the Waterman plan, the amount due an employee on retirement or discharge was not the same as the

amount due a distributee on termination of the plan. Since the court found that Judkins was actually discharged before termination of the plan, there was no good reason for the court to put him on the same distributive basis as the employee who continued to work for Waterman.

In the instant case, as in Judkins and Peebles, the parties stipulated that "on May 5, 1955, the Waterman Steamship Corporation terminated its retirement plan." The status of Judkins, Peebles, and Johnson as Waterman employees on that day—not Judkins's discharge June 1, not the sale of Ryan stock June 14, and not the sale of Waterman stock May 5—determined the right of these three employees to share in the liquidation of the plan.

## VI.

### Summary

■ There is no doubt that the policy argument in favor of capital gains treatment of "bunched" income is as applicable to liquidating payments on termination of a plan as it is to lump-sum payments on separation from service. But participants in employees' trusts enjoy a favored position over other taxpayers

difficult to rationalize.[16] If they are to be further favored by extension of capital gains treatment to liquidating payments received on any termination of a plan, Congress is the one to do it and say so plainly.

Waterman did not disappear in a complete liquidation or merger.[17] The distribution was made to the employees because Waterman—the same company under new management—terminated its plan. Of course sale of the stock triggered the termination, but it did not interrupt the employer-employee relation in any sense that could be translated as tantamount to an employee's "death or other separation from the service" of his employer. After the sale of Waterman stock, the business, along with its full complement of employees, remained intact, clothed in its original corporate cloak. Within the meaning of Section 402, this mere change of stock ownership and control did not effect such a "substantial change in the make-up of employees" as to constitute a mass severance of the employees from their employer.

The judgment below is reversed with direction that the district court enter judgment for the United States.

16. "If a sound case can be made in defense of the postponement of taxation until benefits are actually paid, which sections 402(a) (1) and 403(a) (1) make possible, the same can hardly be said for the long-term capital gain treatment which sections 402(a) (2) and 403(a) (2) provide for certain lump-sum distributions from a qualified plan. The circumstances under which these provisions originated, i. e., in an amendment of section 165 of the 1939 Code by the Revenue Act of 1942, are remarkable, if not unique, as an instance in which Congress has instituted a capital gain provision in the absence of any attempt, either currently or by way of background, to justify capital gain treatment on analytical or conceptual grounds. * * * As a means of alleviating the consequences of bunched income in a single taxable year, extending capital gain treatment to these distributions is indefensible, both on account of its unnecessary crudeness and of the favoritism it entails. The Code, of course, contains several formulas for

spreading bunched income over the period to which it is economically attributable, which more accurately reflect the recipient's tax status under our progressive rate system during that more extended time." Sporn, Taxation of Deferred Compensation Arrangements, 14 Tax L. Rev. 289, 302, 303 (1959). See also Eckerman, The Unrationalized Capital Gains Treatment of Lump-Sum Termination Distributions from Qualified Pension, Profit-Sharing and Annuity Plans, 7 Syracuse L.Rev. 1 (1955).

17. One commentator explains it as follows: "Where X acquires Y as a subsidiary and Y's plan is to be terminated, * * * Distributions to the Y employees of their shares of the plan assets will not qualify for long-term capital gain because, with *Y a continuing corporate entity*, the 'separation from service' requirement is *not* satisfied." (Emphasis added.) Robbins, Effect of Corporate Reorganizations on Pensions and Profit Sharing Plans, N.Y.U. 17th Inst. on Fed.Tax 951, 981 (1959).

GEWIN, Circuit Judge (dissenting).

I respectfully dissent. In my view the majority opinion recognizes, but fails to give proper emphasis to decided cases and rulings of the Internal Revenue Service which support the position of the taxpayer. The following is from the majority opinion:

"For aid and comfort, the taxpayer is compelled to resort to the rulings of the Internal Revenue Service. Surprisingly, the Service has given him a helping hand."

A taxpayer should be able to rely on Revenue rulings, acquiescence by the Internal Revenue Service in decisions and interpretations in the past, and decided cases. The public as well as the government must be considered. Legitimate rights may even accrue in reliance upon an unconstitutional statute. New judicial interpretations which erase the past should be made with great reluctance and caution, and only for strong and impelling reasons. In Chicot County Drainage Dist. v. Baxter State Bank, 308 U.S. 371, 60 S.Ct. 317, 84 L.Ed. 332–33, the Supreme Court said:

"It is quite clear, however, that such broad statements as to the effect of a determination of unconstitutionality must be taken with qualifications. The actual existence of a statute, prior to such a determination, is an operative fact and may have consequences which cannot justly be ignored. The past cannot always be erased by a new judicial declaration. The effect of the subsequent ruling as to invalidity may have to be considered in various aspects,—with respect to particular relations, individual and corporate, and particular conduct, private and official. Questions of rights claimed to have become vested, of status, of prior determinations deemed to have finality and acted upon accordingly, of public policy in the light of the nature both of the statute and of its previous application, demand examination. These questions are among the most difficult of those which have engaged the attention of courts, state and federal, and it is manifest from numerous decisions that an all-inclusive statement of a principle of absolute retroactive invalidity cannot be justified."

The foregoing principle was followed by this Court in a recent opinion by Judge Rives. United States v. Walker, (5th Cir. 1963) 323 F.2d 11.

While the Seventh Circuit in McGowan v. United States, (1960) 277 F.2d 613, ruled against the taxpayer, it did not criticize or undertake to overrule Mary Miller v. Commissioner, (1954) 22 T.C. 293, which had been affirmed by the Sixth Circuit in 1955, 226 F.2d 618. Nor did it undertake to overrule Lester B. Martin v. Commissioner or Judkins v. Commissioner. They were discussed and expressly distinguished.

I find myself in essential agreement with the opinion of the United States District Court in Peebles v. United States, (D.C.S.D.Ala.1962) 208 F.Supp. 385. I would affirm.