Robert E. Beaulieu and Irene A. Beaulieu v. Commissioner. James F. Dean and Mary P. Dean v. Commissioner.
Beaulieu v. Commissioner
Docket Nos. 4464-63, 2040-64.
United States Tax Court
T.C. Memo 1965-303; 1965 Tax Ct. Memo LEXIS 27; 24 T.C.M. (CCH) 1670; T.C.M. (RIA) 65303; November 19, 1965
*27 Held: On the facts presented, distributions to petitioners from employee profit-sharing trusts of which they were beneficiaries were made on account of the termination of the profit-sharing plans and not on account of petitioners' separation from the service of their employer. C. Henry Glovsky, 173 Cabot St., Beverly, Mass., for the petitioners. Robert B. Dugan, for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: Respondent determined deficiencies in the income taxes of petitioners for the year 1960 as follows: Docket
No.
Petitioner
Deficiency
4464-63
Robert E. and Irene A.
Beaulieu
$ 570.87
2040-64
James F. and Mary P.
Dean
1,011.00
The sole issue is whether distributions to petitioners Robert E. Beaulieu and James F. Dean from certain profit-sharing trusts are taxable as ordinary income or capital gain. The issue depends upon whether the distributions were made on account of the separation of these petitioners from the service of their employer within the meaning of section 402(a)(2) of the Internal Revenue Code of 1954. Findings of Fact Some of the facts have been stipulated. The stipulation of facts and exhibits attached to the stipulation are incorporated by *28 this reference. Petitioners Robert E. Beaulieu and Irene A. Beaulieu are husband and wife who reside in Danvers, Massachusetts. Petitioners James F. Dean and Mary P. Dean are husband and wife who reside in Salem, Massachusetts. Both couples filed joint Federal income tax returns for the taxable year 1960 with the district director of internal revenue at Boston, Massachusetts. Since the wives are parties to this proceeding solely because they filed joint returns with their husbands, Robert and James will be referred to as the petitioners. Prior to September 30, 1962, Bomac Laboratories, Inc. (hereinafter referred to as Bomac), was a Massachusetts corporation with its principal place of business in Beverly, Massachusetts. Harold C. Booth (hereinafter referred to as Booth) and Henry J. McCarthy (hereinafter referred to as McCarthy) each owned 50 percent of the capital stock of Bomac from the date of its incorporation until March 1959. At all times herein material Robert was an hourly employee and James was a salaried employee of Bomac. In 1952 Bomac established the Bomac Laboratories Profit-Sharing Trust. In 1956 this trust was amended to cover only employees other than salaried employees, *29 and a new trust, Bomac Laboratories Profit-Sharing Trust for Salaried Employees, was created to cover salaried employees. The profit-sharing plans covering both the hourly and salaried employees met the requirements of section 401 of the Internal Revenue Code of 1954, [1] and the trusts established thereunder were entitled to exemption under the provisions of section 501(a). Robert was a beneficiary of the trust for hourly employees and James was a beneficiary of the trust for salaried employees. The pertinent provisions of the profit-sharing plan and trust for hourly employees and the profit-sharing plan and trust for salaried employees were identical and provided as follows: ARTICLE VI Benefits * * *
Section 6. Benefits because of Severance. * * *
If a Member completes five full years of continuous service with the Company after he becomes a Member and voluntarily terminates his employment with the Company prior to his becoming eligible to receive benefits under any of the preceding sections of this Article VI, a portion of the amount standing to the credit of his account *30 on the last day of the taxable year preceding the termination of his employment shall become nonforfeitable according to the following schedule and, if he does not thereby become entitled to receive one hundred per cent of the amount so standing to the credit of his account, the balance shall (subject to the provisions of Section 5 of Article IX) be forfeited as of the date of termination of his employment: (a) If such termination occurs after the completion of five such years but before the completion of ten such years, 25%. (b) If such termination occurs after the completion of ten such years but before the completion of fifteen such years, 50%. (c) If such termination occurs after the completion of fifteen such years, 100%. In all other cases the full amount standing to the credit of a Member's account as of the last day of the taxable year preceding the termination of his employment shall become nonforfeitable upon termination of employment for any reason including death. * * *
The nonforfeitable portion of the amount standing to the credit of the Member's account at the close of the taxable year preceding the date of termination of his employment shall, following such termination, *31 be segregated in cash and held by the Trustee as provided in Section 7 of this Article and shall be paid to him in cash in a lump sum or in such number of substantially equal annual instalments, not exceeding five, as the Committee may determine. * * * ARTICLE IX Amendment and Termination * * * Section 5. Upon termination of the Plan and Trust, as provided in Section 4 of this Article, all expenses to the date of termination shall be paid and a proportionate adjustment of all accounts shall be made to reflect such expenses, fund losses or profits and reallocations to the date of termination. The amount credited to each account at the date of termination, after such payment and adjustment, shall be completely vested as of the date of termination in the Member (subject to any changes resulting from subsequent annual adjustments as provided in Section 4 of Article V). * * *
The amount credited at the date of termination to the account of each Member who was then in the service of the Company shall be held by the Trustee as long as the Member remains in the service of the Company and (i) upon his death, while in the service of the Company, shall be dealt with and distributed by the Trustee *32 at the times and in the manner provided in Sections 4 and 5 of Article VI; (ii) upon his retirement due to attainment of age 65 or due to permanent and total disability, shall be dealt with and distributed by the Trustee at the times and in the manner provided in Section 3 of Article VI and, in the event of purchase of a life annuity contract, in accordance also with applicable provisions of Section 7 of Article VI; (iii) if he ceases to be in the service of the Company for any reason other than death or retirement for the causes stated in the preceding clause (ii), shall be distributed to him by the Trustee in a lump sum or in such number of substantially equal annual instalments, not exceeding five, as the Committee may determine, provided that in the event of his death prior to the payment to him of the entire balance standing to the credit of his account, such balance shall be distributed by the Trustee upon his death in the manner provided in Sections 4 and 5 of Article VI. Bomac could terminate the plan and trust at any time by written notice to the trustee executed on behalf of Bomac by authority of its board of directors. Bomac could also discontinue contributions to the trusts *33 at any time, but in the absence of formal action effecting termination, a failure to make contributions did not terminate the plan or operate to accelerate distribution of the participants' interests. However, upon failure of Bomac to make a contribution for any taxable year the participants' interests vested at the expiration of the time provided for the filing of the company's income tax return. A profit-sharing committee was established to perform specified duties in administering the plan and a trustee was appointed to administer the trust fund. Varian Associates (hereinafter referred to as Varian) is a publicly-held California corporation. On March 24, 1959, Varian had approximately 2 million shares of capital stock outstanding. On January 14, 1959, Varian entered into an agreement with Booth and McCarthy wherein it agreed to exchange 190,477 shares of its common stock for 400 shares, or 80 percent, of the capital stock of Bomac. On February 26, 1959, Varian entered into an additional agreement with Booth and McCarthy providing for the exchange of Varian stock for the remaining 100 shares, or 20 percent, of the outstanding Bomac stock on July 2, 1962. Varian had the option at *34 any time to accelerate this closing date with respect to any or all of the 100 shares and Booth and McCarthy each had the right to accelerate the closing date with respect to all of the shares upon 30 days' notice if: (1) Either ceased to be directors of Bomac or Varian (after March 31, 1959) other than by reason of resignation or declination to act; (2) they ceased to hold the offices of president and executive vice president of Bomac other than by resignation or declination to act; (3) there was a failure to elect and continue to re-elect at least one of them as vice president of Varian; (4) the present rate of compensation by Bomac to either was reduced; (5) either died or became legally incompetent; or (6) the aggregate of the value, as of the exchange date, of Varian shares previously exchanged under the agreement plus the shares remaining to be exchanged equaled the greater of a specified sum or the amount then authorized for issue by the California Commissioner of Corporations. The agreement further provided that in the event that Bomac was liquidated, consolidated into or merged with Varian, or vice versa, the value of the interests received by Booth and McCarthy would approximate *35 that which they would have received in the absence of such liquidating consolidation or merger. On March 24, 1959, pursuant to the agreement of January 14, 1959, Varian acquired 80 percent of the capital stock of Bomac. On June 30, 1962, Varian acquired the remaining 20 percent of Bomac's outstanding stock. On September 30, 1962, Bomac was liquidated and its assets were transferred to Varian. Sometime thereafter Bomac was dissolved. Booth and McCarthy remained directors and officers of Bomac until its liquidation. On June 1, 1959, the board of directors of Bomac voted to adopt the Varian Profit-Sharing Retirement Plan for Bomac employees and to discontinue contributions to the Bomac profit-sharing trusts. The board further voted that the Bomac profit-sharing plans be amended to provide for a complete vesting of interests in the participants as of December 31, 1958, and that the profit-sharing committee, upon application of a participant, could in its discretion authorize the trustee to distribute the participant's interest. Subsequent to June 1, 1959, Bomac applied for and received rulings from the Internal Revenue Service that the proposed action would not affect the tax exempt status *36 of the trusts or the deductibility of prior contributions by Bomac to the trusts. On March 17, 1960, in implementation of its action of June 1, 1959, the board of directors of Bomac terminated the Bomac profit-sharing trusts and amended Article IX, section 5(iii), of the profit-sharing plans to provide that if he ceases to be in the service of Bomac for any reason other than death or retirement, a participant could elect within 60 days to have his interest distributed to him in a lump sum. [2] *38 The board further amended Article IX, section 5, of the plans to provide as follows: (a) that the Committee shall on or before April 15, 1960 notify each member who was in the service of the company on December 31, 1958 of the following provisions of this Section 5. (i) that upon written request received from such member who was in the service of the company on December 31, 1958 on or before May 1, 1960, the Committee in its discretion may direct the Trustee to distribute in a lump sum the entire amount credited to the account of such member as of the close of business on February 29, 1960; such distribution to be made on June 1, 1960, and (ii) that any member who fails to file such written request *37 on or before May 1, 1960 shall be deemed irrevocably to have elected that his interest be held in the Bomac Trust Fund or be paid over to the trustee of the Profit Sharing Retirement Plan of Varian Associates as the Committee may properly determine. The Varian plan was extended to cover Bomac employees and, pursuant to the vote of Bomac's board of directors on June 1, 1959, both Robert and James became participants in the Varian plan. On or about June 1, 1960, Robert received a distribution of $4,845.17 from the Bomac trust for hourly employees and James received a distribution of $7,125.06 from the Bomac trust for salaried employees. These amounts represented contributions to the trusts by Bomac and also represented each petitioner's entire remaining interest in the trust. When Varian acquired controlling interest in Bomac on March 24, 1959, it had approximately 1,861 employees and Bomac had approximately 758 employees. Shortly thereafter, the supervisor of industrial engineering at Bomac was made its director of personnel and public relations. There were little or no other significant changes in personnel at that time. In November 1959 a former employee of Varian was made director of engineering at Bomac. In February 1960 Varian created two positions in its executive *39 hierarchy for the purpose of coordinating the operations of its subsidiaries and divisions. One of these executives, the group executive for tubes, was responsible for co-ordinating the activities of Bomac, two other Varian subsidiaries and one division of Varian. Due to a decline in Bomac's business, there was a steady decline in the number of Bomac employees between November 1959 and June 1, 1960. After Varian acquired control of Bomac, certain accounting practices of Bomac were changed to conform to those of Varian, and Bomac's financial statements were incorporated into Varian's monthly consolidated statements. Certain personnel policies of Bomac, in addition to the profit-sharing plan, were also changed to conform to Varian's practices, Varian's wage and salary evaluation plan was established at Bomac, the Varian corporate magazine replaced the Bomac magazine, and Bomac employees were included in the Varian group insurance program. These changes were made in an effort to increase the employees' sense of participation in one company. On June 1, 1959, the board of directors of Bomac, at the instigation of Varian, voted to construct an additional plant. The construction of this building *40 was financed by Varian. On their Federal income tax returns for 1960 Robert and James reported the distributions of $4,845.17 and $7,125.06, respectively, which they received from the Bomac profit-sharing trusts, as long-term capital gain, and included in their adjusted gross income the amount of $2,422.59 and $3,562.53, respectively. In his statutory notices of deficiencies respondent determined that the distributions from the Bomac trusts were ordinary income, and that therefore the entire amount of the distribution to each petitioner was includible in his adjusted gross income. The distributions to Robert and James from the Bomac profit-sharing trusts were made because of the termination of the Bomac profit-sharing plans, and not on account of their separation from the service of their employer. Opinion The only issue is whether the distributions received by Robert and James in 1960 from the Bomac profit-sharing trust of which they were beneficiaries are taxable as long-term capital gain or as ordinary income. Section 402 prescribes the manner in which distributions from qualified employee profit-sharing trusts are taxed to the beneficiaries of the trust. As a general rule, such *41 distributions are taxed to the recipient as an annuity under section 72 in the year distributed or made available to him. [3] Under section 72, if no part of an annuity received in the taxable year is attributable to the investment of the recipient, the entire amount of the annuity is taxable as ordinary income. Under section 402(a)(2), [4] *42 however, if the total amount of an employee's interest in a qualified trust is distributed within one taxable year on account of the employee's death or other separation from the service, the amount of the distribution exceeding the amounts contributed to the trust by the employee is taxable as long-term capital gain. Petitioners contend that the amounts received *43 by them in 1960 from the Bomac profit-sharing trusts, representing their entire interests in those trusts, were distributed on account of their separation from the service and are taxable as long-term capital gain. In support of this contention petitioners argue that they ceased to be employees of Bomac and became Varian employees on March 24, 1959, when Varian acquired 80 percent of Bomac's stock. It has been held, however, that a change in the ownership of corporate stock is not in itself a change of employers. United States v. Martin, 337 F. 2d 171 (C.A. 8); United States v. Johnson, 331 F. 2d 943 (C.A. 5); Nelson v. United States, 222 F. Supp. 712 (D.C.Idaho). Bomac was a viable corporation conducting substantial business activities until September 30, 1962. The degree of control exercised by Varian over Bomac's activities was no greater than that normally exercised by a parent corporation over a subsidiary. There is no indication that Bomac's corporate status was in any sense a sham, and to hypothesize for tax purposes that employees of Bomac were Varian employees would be an unjustified disregard of the corporate form. Moline Properties, Inc. v. Commissioner, 319 U.S. 436; *44 United States v. Johnson, supra; Nelson v. United States, supra.
The cases of Mary Miller, 22 T.C. 293, affd. per curiam 226 F. 2d 618 (C.A. 6), and Lester B. Martin, 26 T.C. 100, relied upon by petitioners, are inapposite. Unlike the present case, the corporation originating the plan in each of those cases had been liquidated and its assets transferred to its successor before the effective date on which the employee plan was terminated and the distributions pursuant thereto made. In holding that the distributions were made on account of the taxpayers' separation from the service, this Court in both cases stated that the taxpayer was separated from the service of the original corporation when that corporation was liquidated and its assets transferred, that the taxpayer's interest under the plan became fixed at that time because of the termination of his employment and that the subsequent termination of the plan and distribution of his interest pursuant thereto did not affect his rights. Thomas E. Judkins, 31 T.C. 1022, concerning a distribution under the employee plan involved in the United States v. Martin and United States v. Johnson cases, supra, is also inapplicable since *45 in that case the taxpayer's employment actually terminated before the distribution was made and, as the Court found, before the plan had definitely been terminated. Petitioners also argue that the distributions to Robert and James were made on account of their separation from the service of Bomac because the distributions were incidental to Bomac's liquidation and merger with Varian. The evidence does not establish that the liquidation and merger of Bomac with Varian was contemplated at the time of Varian's acquisition of 80 percent of Bomac's stock or at the time the Bomac plan was terminated and the distributions pursuant thereto made. The merger did not occur until over two years after these events. Varian conducted its operations both through divisions and subsidiaries and the fact that on February 26, 1959, it contracted to purchase the remaining 20 percent of Bomac stock in 1962 does not indicate that it then contemplated liquidating Bomac. The fact that the contract of purchase provided for a fair adjustment of the consideration payable to Booth and McCarthy in the event either Bomac or Varian was liquidated, consolidated with or merged into the other indicates that the merger *46 of Bomac with Varian was no more than a contemplated possibility at that time. However, even if the subsequent merger had been an integral part of the reorganization plan, it does not follow that the distributions upon termination of the Bomac plans were made on account of separation from the service within the meaning of section 402. When section 402 was adopted in 1954, Congress inserted a relief provision in section 402(e) for the benefit of certain taxpayers who were thought to have misconstrued the meaning of the separation from the service provision of the predecessor of section 402. Section 402(e) provides that a distribution made during the calendar year 1954 because of the complete termination of an employee plan incident to the liquidation of a corporate employer which occurred before the enactment of the 1954 provisions shall be considered to be a distribution on account of separation from service. [5] The fact that section 402(e) applies only to distributions made in 1954 indicates that Congress intended that distributions after 1954 on account of the termination of an employee plan, even though the termination was incidental to the liquidation of the corporate employer establishing *47 the plan, would not qualify for capital gain treatment unless otherwise on account of separation from the service. See United States v. Johnson, supra.We also find no merit in petitioners' contention that there is a separation from service when the liquidation and merger is accompanied by a substantial change in the makeup of employees, since the facts in the instant case show that there was only minor shifting of personnel as a result of Varian's acquisition of Bomac. At the time the Bomac profit-sharing plans were terminated and the distributions *48 from the Bomac trusts were made, Robert and James were employees of Bomac. They were not separated from the service of Bomac prior to the liquidation of that corporation and the transfer of its assets to Varian on September 30, 1962. Petitioners' rights under the Bomac profit-sharing plans were fixed upon the termination of the plans on March 17, 1960. We have found as a fact and hold that the distributions to Robert and James from the Bomac trusts in 1960 were made because the Bomac profit-sharing plans were terminated and not on account of petitioners' separation from the service of Bomac. Cf. McGowan v. United States, 277 F. 2d 613 (C.A. 7); Clarence F. Buckley, 29 T.C. 455. Decisions will be entered for the respondent. Footnotes
1. Except as otherwise indicated, all section references hereinafter will refer to the Internal Revenue Code of 1954.↩
2. Section 5(iii) of Article IX of the plans, as amended, reads as follows: (iii) if he ceases to be in the service of the Company for any reason other than death or retirement for the causes stated in the preceding clause (ii) the Committee shall notify him that he may by notice in writing to the Trustee tiven within sixty (60) days after he ceases to be in the service of the Company, elect to have distributed to him by the Trustee in a lump sum his entire account as of the end of the semi-annual period (June 30 or December 31) occurring next after he gives such notice; and if he does not make such election the amount credited to his account as of the end of such seminannual period shall be distributed to him by the Trustee in a lump sum or in such number of substantially equal annual installments, not exceeding five, as the Committee may determine, provided that in the event of his death prior to the payment to him of the entire balance standing to the credit of his account, such balance shall be distributed by the Trustee upon his death in the manner provided in Sections 4 and 5 of Article VI;
3. SEC. 402. TAXABILITY OF BENEFICIARY OF EMPLOYEES' TRUST. (a) Taxability of Beneficiary of Exempt Trust. - (1) General Rule. - Except as provided in paragraphs (2) and (4), the amount actually distributed or made available to any distributee by any employees' trust described in section 401(a) which is exempt from tax under section 501(a) shall be taxable to him, in the year in which so distributed or made available, under section 72 (relating to annuities) except that section 72(e)(3)↩ shall not apply. * * * 4. SEC. 402. TAXABILITY OF BENEFICIARY OF EMPLOYEES' TRUST. (a) Taxability of Beneficiary of Exempt Trust. - * * *
(2) Capital Gains Treatment for Certain Distributions. - In the case of an employees' trust described in section 401(a), which is exempt from tax under section 501(a), if the total distributions payable with respect to any employee are paid to the distributee within 1 taxable year of the distributee on account of the employee's death or other separation from the service, or on account of the death of the employee after this separation from the service, the amount of such distribution, to the extent exceeding the amounts contributed by the employee (determined by applying section 72(f)↩), which employee contributions shall be reduced by any amounts theretofore distributed to him which were not includible in gross income, shall be considered a gain from the sale or exchange of a capital asset held for more than 6 months. * * * The amount of such net unrealized appreciation and the resulting adjustments to basis of the securities of the employer corporation so distributed shall be determined in accordance with regulations prescribed by the Secretary or his delegate.
5. SEC. 402. TAXABILITY OF BENEFICIARY OF EMPLOYEES' TRUST. * * *
(e) Certain Plan Terminations. - For purposes of subsection (a)(2), distributions made after December 31, 1953, and before January 1, 1955, as a result of the complete termination of a stock bonus, pension, or profit-sharing plan of an employer which is a corporation, if the termination of the plan is incident to the complete liquidation, occurring before the date of enactment of this title, of the corporation, whether or not such liquidation is incident to a reorganization as defined in section 368(a), shall be considered to be distributions on account of separation from service.↩